PER CURIAM.
David Joseph Pittman appeals the post-conviction court’s order denying his motion filed pursuant to Florida Rule of Criminal Procedure 3.850 to vacate his first-degree murder convictions and sentences of death, and he petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. We affirm the denial of rule 3.850 relief and deny the habeas petition.
I. BACKGROUND
In this first-degree murder case in which a sentence of death was imposed, Pittman appeals the denial of his first rule 3.850 motion, after an evidentiary hearing. The facts of the underlying crimes are set forth in the Court’s opinion on direct appeal:
The record reflects that, shortly after 3 a.m. on May 15, 1990, a newspaper deliveryman in Mulberry, Florida, reported to law enforcement authorities that he had just seen a burst of flame on the horizon. When the authorities investigated they found the home of Clarence and Barbara Knowles fully engulfed in fire. After the fire was extinguished, the police entered the house and discovered the bodies of Clarence and Barbara, as well as the body of their twenty-year-old daughter, Bonnie. Although all of the bodies were burned in the fire, a medical examiner determined that the cause of death in each instance was massive bleeding from multiple stab wounds. In addition, the medical examiner testified that Bonnie Knowles’ throat had been cut. A subsequent investigation revealed that the fire was the result of arson, that the phone line to the house had been cut, and that Bonnie Knowles’ brown Toyota was missing.
A construction worker testified that, when he arrived at work at 6:30 a.m. on the morning of the fire, he noticed a brown Toyota in a ditch on the side of the road near his job site. Other testimony revealed that the location of the Toyota was about one-half mile from the Knowles residence. The worker also observed a homemade wrecker, which he later identified as belonging to Pittman, pull up to the Toyota and, shortly thereafter, saw a cloud of smoke coming from that direction. Another witness who lived near the construction site also *800 saw the smoke and observed a man running away from a burning car. This witness later identified Pittman from a photo-pack as the man she saw that morning. Investigators determined that the car fire, like the earlier house fire, was the work of an arsonist.
At the time of the murders, another of the Knowles’ daughters, Marie, was in the process of divorcing Pittman. The divorce was not amicable and the State introduced testimony that Pittman had made several threats against Marie and her family. The State also produced evidence that Pittman had recently learned that Bonnie Knowles had tried to press criminal charges against him for an alleged rape that had occurred five years earlier.
Carl Hughes, a jailhouse informant, testified that Pittman told him that he had gone to the Knowles’ house on the evening of the murders to speak with Bonnie Knowles about the problems he was having with her family. Bonnie let Pittman in the house and, when she refused his sexual advances, he killed her to stop her cries for help. Pittman then admitted to killing Barbara Knowles in the hallway outside Bonnie’s bedroom and to killing Clarence in the living room as Clarence tried to use the phone. Pittman also told Hughes that he burned the house, stole the Toyota and abandoned it on the side of the road, and later returned to the Toyota and burned it as well.
The record further reflects that Pittman feared that the police suspected his involvement in the murders, and, at the prompting of his mother, Pittman turned himself in to the police on the day after the murders.
In response to the prosecution’s case, the defense presented testimony critical of the police investigation and attempted to establish that Marie, Pittman’s former wife, and her new husband had a motive to commit the murders. Pittman testified in his own defense and stated that he had nothing to do with the crimes charged. He also denied that he had told anyone he had committed the murders. The jury found Pittman guilty of three counts of first-degree murder, two counts of arson, and one count of grand theft, and found him not guilty of burglary.
In the penalty phase, the State established that Pittman was convicted of aggravated assault in 1985. In mitigation, Pittman presented the testimony of his mother that he was a difficult child to deal with and that she had disciplined him severely. A clinical psychologist testified that Pittman’s father was a paranoid schizophrenic; that as a child Pittman suffered from a severe attention deficit disorder with hyperactivity; and that Pittman has organic personality syndrome, which causes paranoia and an unstable mood. After hearing this testimony, the jury recommended the death penalty for each murder conviction by a vote of 9 to 3. In his sentencing order, the judge found two aggravating circumstances for each murder: (1) previous conviction of another capital or violent felony, and (2) the murders were heinous, atrocious, or cruel. The judge then expressly rejected the mitigating factors of Pittman’s being under the influence of extreme mental and emotional disturbance [1] and concluded that the *801 aggravating factors outweighed the proven mitigating factors. The judge imposed the death penalty for each murder. Pittman v. State, 646 So.2d 167, 168-69 (Fla.1994). On direct appeal, Pittman raised ten issues.[2] The Court affirmed the convictions and sentences.
*802 Pittman filed a rule 3.850 motion in 1997 and then Sled an amended motion in 2001. After holding a Huff[3] hearing in March 2002, the postconviction court ruled that an evidentiary hearing was required on claims 1, 2, 3 and 7,[4] and the court summarily denied the remaining claims. Pittman then filed a further amended motion in 2005, and the court, after holding a second Huff hearing in January 2006, again ruled that an evidentiary hearing was required on claims 1, 2, 3 and 7. The court held the evidentiary hearing on May 8-11, 2006.[5] The court also held a limited evidentiary *803 hearing on a sub-claim on February 15, 2007.[6] Pittman subsequently filed an additional amendment in March 2007, raising two lethal injection claims, and the court held a third Huff hearing in April 2007. The court ruled that an evidentiary hearing was not required on the new claims. Pittman then filed an additional amendment in June 2007, raising a newly discovered evidence claim with respect to witness Chastity Eagan. The court held a fourth Huff hearing in June 2007 and ruled that an evidentiary hearing was required on this claim. The court held the evidentiary hearing on July 27, 2007.[7] Several months later, on November 5, 2007, the court entered an order denying postconviction relief. Pittman filed the present appeal, raising nine guilt phase issues and three penalty phase issues.[8] *804 He also filed the present habeas petition, raising six issues.[9]
II. APPEAL OF RULE 3.850 MOTION
A. Brady Claim Concerning Carl Hughes
In this claim, Pittman asserts that the postconviction court erred in denying his Brady claim with respect to inmate Carl Hughes. The United States Supreme Court in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), held that a prosecutor must disclose material information that is favorable to the defense. To establish a Brady violation, a defendant must show the following: (1) the State suppressed evidence, either exculpatory or impeaching, that was favorable to the defense; (2) the State did so either willfully or inadvertently; and (3) the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). To satisfy the prejudice prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict. Id. A reasonable probability is a probability sufficient “to undermine confidence in the verdict.” Id. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). A court’s decision with respect to a Brady claim is a mixed question of law and fact, and a reviewing court will defer to the lower court’s factual findings if they are supported by competent, substantial evidence, but will review the court’s application of law to facts de novo, Mordenti v. State, 894 So.2d 161, 168 (Fla. 2004); Way v. State, 760 So.2d 903, 913 (Fla.2000), and the reviewing court will review the cumulative effect of the suppressed evidence de novo. Mordenti, 894 So.2d at 168.
In this claim, Pittman asserts that the State failed to disclose certain evidence with respect to inmate Carl Hughes, including the following: (1) certain facts concerning Hughes’ ex-wife, Kathleen Anders; *805 (2) Assistant State Attorney (ASA) Pick-ard’s letter dated October 11, 1990, to Detective Cosper; (3) Cosper’s handwritten notes of a July 6, 1990, interview with Hughes; and (4) Hughes’ presentence investigation report. Pittman asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at length at the evidentiary hearing below, and the postconviction court ruled as follows:
The Defendant alleges that Carl Hughes, who testified against Mr. Pittman at the trial, was placed with Mr. Pittman so that he could assist the State. The defense argues that Mr. Hughes acted as a State agent and that the State’s action in placing Mr. Hughes with Mr. Pittman violated Mr. Pittman’s Sixth Amendment rights. The Defendant alleges that the State withheld favorable evidence concerning Carl Hughes a witness for the State at the Defendant’s trial. Mr. Hughes testified at trial that the Defendant had confessed to the murders he was charged with. Mr. Hughes’s ex-wife, Kathleen Anders, was called by the defense as a witness at the evidentiary hearing. Ms. Anders testified that Mr. Hughes asked her for money when he was incarcerated at the Polk County Jail and became angry with her when she said she didn’t have the money. Ms. Anders testified that Mr. Hughes told her he was trying to keep her from being arrested, and he had been asked by the Florida Department of Law Enforcement to obtain information regarding the Pittman case. Ms. Anders testified that Mr. Hughes told her that she was under surveillance. Ms. Anders testified that she spoke with Assistant State Attorney David Bergdoll and was given a polygraph test. At the evidentiary hearing, Assistant State Attorney Hardy Pickard testified that he did not recall learning of any polygraph being given to Ms. Anders or about any potential criminal charges against her. Ms. Anders said she was in contact with FDLE agent Randy Dey, and she did not recall if Mr. Hughes asked her to tell Mr. Dey that he had some information on Pittman. Ms. Anders testified that she did frequently relay messages back and forth between Mr. Hughes and Mr. Dey, but they were not related to Mr. Pittman’s case. Mr. Norgard, the Defendant’s trial counsel testified at the evidentiary hearing that if he had known of a threat of criminal prosecution to Mr. Hughes’ wife by the State Attorney’s office or law enforcement it would have been an area of impeachment he would have gone into, and he would have wanted to contact Mr. Hughes’ wife to inquire about the threat. At the trial, Mr. Hughes testified that he did not get any rewards or incentives for testifying. Mr. Norgard testified that if he had contacted Ms. Anders and learned that Hughes had said he needed to get information against Mr. Pittman to save her from prosecution, he would have pursued the evidence as indicating that Mr. Hughes was an agent within the meaning of the Fifth and Sixth Amendment.
A review of the direct and cross-examination of Mr. Hughes at trial shows that any purported deal Mr. Pittman thinks Mr. Hughes received was addressed on direct examination and cross-examination at trial. On cross-examination it was brought out that Mr. Hughes had written a letter to the sentencing judge prior to his sentencing letting him know of his cooperation with FBI, and FDLE on HUD cases and in the David Pittman case. It was also brought out that ASA Bergdoll told the court at sentencing that looking at the cooperation and full magnitude of his case they had arrived at a recommendation of 6 years rather than 85 years.... Even assuming the undisclosed evidence regarding *806 Ms. Anders had some impeachment value, the Court finds that the Defendant has not shown any reasonable probability that this information weakens the case against the Defendant so as to give rise to a reasonable doubt as to his culpability or might have led to a different jury verdict.
The Defendant alleges that ... a letter from Mr. Pickard to Detective Cos-per addressing the possibility of holding Mr. Hughes in contempt if he refused to testify constituted Brady material and should have been disclosed to defense counsel. The Court does not find that this letter constitutes Brady material. This matter was specifically addressed at trial, and Mr. Hughes admitted that he knew he could be incarcerated for more time for contempt if he refused to testify.
The Defendant alleges that ... some handwritten notes of an interview Detective Cosper had with Mr. Hughes on July 6,1990, constituted Brady material. The defense particularly focused on a handwritten note by Detective Cosper that said “real off on time of occurrence.” The defense argues that they were not advised that the interview took place, and information showing more contact between Mr. Hughes and law enforcement was important because it could be used to show that Mr. Hughes’ story improved as he met with law enforcement. At the evidentiary hearing, the defense was not able to elicit any further information from Mr. Cosper regarding what he might have meant by, “real off on time of occurrence.” Mr. Pickard testified that he may not have been aware of all the contacts Detective Cosper had with Mr. Hughes. The court does not find that this note constitutes material information under Brady. The Court does not find that the evidence could have any reasonable probability of producing a different outcome at the trial.
The Defendant alleges that ... Mr. Hughes’ PSI prepared in his State Court case constitutes Brady material that should have been disclosed to the defense. Defense Counsel Robert Nor-gard testified that he could have filed a motion requesting Mr. Hughes’ PSI. The defense has not shown that defense counsel could not have obtained the PSI through the exercise of reasonable diligence, and the Court finds no Brady violation.
Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a Brady violation with respect to this claim.
B. Brady Claim Concerning David Pounds
In this claim, Pittman asserts that the State failed to disclose certain evidence with respect to inmate David Pounds, including the following: (1) Pounds’ PSI and jail and prison records, and (2) Detective Cosper’s notes concerning a June 18 or 19, 1990, interview with Pounds. Pittman asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at length at the evidentiary hearing below and the postconviction court ruled as follows:
*807 The Defendant alleges that there was undisclosed impeachment evidence regarding witness David Pounds. Mr. Pounds testified at the Defendant’s trial for the State. The Defense claims that the State improperly withheld David Pounds’ 1990 PSI, which included a detailed psychological history of Pounds and could have been used to address the mental health of Mr. Pounds. Assistant State Attorney Hardy Pickard testified that he never looked into Mr. Pounds’ mental health issues. Mr. Norgard testified at the evidentiary hearing that if he had been aware of information in the PSI regarding Mr. Pounds’ mental health he would have explored it through discovery to see how he could use it to impeach Mr. Pounds at the trial. Defense counsel did not ask the Court to provide the PSI to the defense. The defense has not shown that defense counsel could not have obtained the PSI through the exercise of reasonable diligence, and the Court finds no Brady violation.
Mr. Pounds listed the names of other people he thought might have been in the jail pod along with him and Mr. Pittman in a transcript of a taped statement taken on June 25, 1990. Mr. Pounds included the name of Carl Hughes as one of the people. The defense tried unsuccessfully to obtain information regarding the jail records and alleges that the State was in possession of a police report concerning jail locations and recreation yard schedules for May 18-21, 1990, that should have been provided to the defense. The exhibit showed that Carl Hughes was not listed as being in the jail at the time. The defense alleges that the jail roster could have been used to locate inmate Reyome and impeach David Pounds by demonstrating that Mr. Hughes was never in the same jail pod with Mr. Pounds. The jail log would not have shown that Mr. Pittman and Hughes were never together, or that Mr. Pounds and Mr. Hughes were never together. Mr. Reyome’s testimony at the evidentiary hearing indicated that inmates in Pod 227 could see and talk to inmates in Pod 228.
At the evidentiary hearing, Assistant State Attorney Pickard testified that he was unaware of Detective Cosper’s handwritten notes of his interviews with David Pounds on June 4, 1990, June 18, 1990, and June 25, 1990. Police reports and Pound’s taped statements to law enforcement on June 4, 1990, and June 25, 1990, were disclosed to the defense at the time of the trial. The defense alleges that the State violated Brady by not providing Detective Cosper’s handwritten notes, which indicated he may have interviewed Pounds on June 18, 1990. In a 1990 deposition, Detective Cosper acknowledged only two interviews with David Pounds. At the time of trial, David Pounds indicated that Detective Cosper only spoke to him twice. Detective Cosper’s handwritten notes of June 18, 1990, are very abbreviated and appear to do nothing more than confirm contact information and coincide with Detective Cosper’s arrangement to interview Pounds at the DOC reception center. At the evidentiary hearing, Mr. Norgard discussed as an example of impeachment a reference to Carl Hughes in Mr. Pound’s June 25 statement, and its relationship to undisclosed evidence demonstrating that Mr. Pounds and Mr. Hughes were not in the jail pod together with Mr. Pittman. As indicated above, the State Attorney’s office was not aware of the handwritten notes of Detective Cosper. At the evidentiary hearing, Detective Cosper was not able to provide any relevant information to further explain the notes he took at the three interviews. The Court does not find ... anything in the [handwritten] *808 notes that could reasonably be taken to put the case in such a different light that it undermines confidence in the verdict.
The defense alleges that the newly discovered information regarding David Pounds undermines confidence in the outcome of Mr. Pittman’s trial. The Court does not find that the evidence could have any reasonable probability of producing a different outcome at the trial.
The Defendant’s allegations with regard to ineffective assistance of counsel are addressed more fully in [a different claim]. However, the Court does not find that the evidence supports a conclusion that trial counsel’s performance with regard to discovering this information with regard to Mr. Pounds falls below an objective standard of reasonableness, or that but for his errors the outcome might have been different.
Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a Brady violation with respect to this claim.
C. Brady Claim Concerning the Handwritten Notes of Other Witness Interviews
In this claim, Pittman asserts that the State failed to disclose the notes of witness interviews, including the following: (1) notes taken by Dectective Cosper and ASA Pickard during a May 31, 1990, interview with Barbara Marie Pittman in which she indicated that her sister, the victim Bonnie, was known for “making up physical ailments,” and in which she indicated that Pittman “and my parents had [a] pretty good relationship”; and (2) notes showing the correct address of Aaron Gibbons, a witness concerning the George Hodges letter. Pittman asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postconviction court ruled as follows:
Defendant alleges that notes taken by Detective Cosper of an interview of Marie Pittman, Defense exhibit 13, indicated that Marie Pittman told him that Bonnie made up physical ailments. The defense alleges this statement by Marie was never disclosed to them. The defense alleges that had this information been provided to the defense they could have argued to the jury that the rape allegation was another example of Bonnie’s fabrications or was being used to strengthen Marie’s position in a pending divorce and custody battle.
At the evidentiary hearing Detective Cosper was not able to add to the information contained in his abbreviated notes, and the State Attorney’s office was not aware that these notes existed. The Court [finds that] ... [although the notes might contain some information that might be considered favorable to the defense, there is no reasonable probability that the jury verdict would have been different had the suppressed information been used at trial.
Mr. Pittman also alleges that the State withheld information from Mr. Cosper’s notes that Mr. Pittman had a good relationship with Marie Pittman’s parents.... [However,] the statement regarding Mr. Pittman’s relationship with his wife’s parents does not indicate what period of time is being discussed. At the evidentiary hearing Detective *809 Cosper was not able to add to the information contained in his abbreviated notes, and the State Attorney’s office was not aware that these notes existed. The Court [finds that] ... [although the notes might contain some information that might be considered favorable to the defense, there is no reasonable probability that the jury verdict would have been different had the suppressed information been used at trial.
[[Image here]]
The Defendant also alleges that the State withheld information from the defense concerning its investigation of the George Hodges letter. The Defendant alleges that the State withheld evidence contained in a note from Dee Dee Wright to Mr. Pickard advising him that Mr. Gibbons had not taken off, and he had moved to a specific address. The Defendant alleges this information was intentionally withheld from the defense in order to keep them from having further access to Mr. Gibbons....
The Defendant alleges the information that was withheld clearly contributed to the trial court’s decision to exclude the evidence. The Defendant argues that had everything been revealed to the defense, the defense would have been permitted to present Mr. Watson’s confession to the murder. At the evidentiary hearing Assistant State Attorney Pick-ard testified that he had no knowledge of Mr. Gibbons supposedly taking off, and he said that both Mr. Gibbons and Mr. Watson showed up in court for a hearing that was held with regard to the George Hodges letter. The Court finds that the defense has not supported any reason to believe the trial court’s decision to exclude the evidence would have been affected by disclosure of this information.
Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. The court’s factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a Brady violation with respect to this claim.
D. Brady Claim Concerning Dennis Waters’ Identification of the Wrecker
In this claim, Pittman asserts that the State failed to disclose the fact that Dennis Waters had advised law enforcement officers that his identification of the wrecker as belonging to Pittman was uncertain. Pittman asserts that the postcon-viction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postcon-viction court ruled as follows:
The defense alleges that there is new information that could be used to impeach the testimony of witness Dennis Waters. At the evidentiary hearing, Dennis Waters testified that he was concerned that his testimony at the trial did not convey the doubt he had regarding the wrecker he saw on the morning after the murders. Mr. Waters testified that he had advised law enforcement officers of his doubts that the wrecker was in fact Mr. Pittman’s wrecker. In pre-trial deposition on December 27, 1990, Mr. Waters identified the wrecker he saw at Mr. Barker’s place as being similar to the wrecker he saw on Prairie Mine *810 Road. At trial, Mr. Waters identified the wrecker as being the same wrecker after noting some distinctive Bondo on the hood. The defense claims that information that Mr. Waters’ identification was equivocal could have been used as valuable impeachment. Although Mr. Nor-gard testified at the evidentiary hearing that he was unaware of any information that Mr. Waters’ identification of the wrecker was equivocal, the equivocal nature of Mr. Waters’ deposition had already put the defense on notice that he had vacillating levels of certainty on the matter. The Court finds the defense’s allegation of a Brady violation in this matter to be without merit.
Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. The court’s factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a Brady violation with respect to this claim.
E. Brady Claim with Respect to Evidence Concerning William Smith
In this claim, Pittman asserts that the State failed to disclose William Smith’s statement that the man who had been arrested for the murders looked like the same person he had seen behind a car dealership two or three weeks prior to the crimes. Pittman claims that the postcon-viction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postcon-viction court acknowledged it in its order and then summarily denied relief:
The Defendant alleges that Mr. Smith was interviewed in July of 1990 by the State, and he told them that the individual he had seen behind the convenience store looked like an individual he had seen at a car dealership 2 or 3 weeks before that time. The Defendant alleges that the defense was never provided with this information despite the fact that statements of witnesses are required to be disclosed pursuant to rule 3.220, Fla. R.Crim. P. The defendant alleges that had defense counsel known about this statement, the statement could have been used to cast doubt on Mr. Smith’s identification of the Defendant.
Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a Brady violation with respect to this claim.
F. Cumulative Effect of All the Withheld and Newly Discovered Evidence and Evidence of Ineffective Assistance of Counsel
In this claim, Pittman asserts that the postconviction court erred in denying relief based on the cumulative effect of all the withheld evidence and newly discovered evidence and evidence of ineffective assis *811 tance of trial counsel (IAC), as discussed below. The various individual allegations made by Pittman were addressed at length at the evidentiary hearing below and in the postconviction court’s order denying relief, and the court concluded as follows with respect to this claim:
The Defendant alleges that the new Jones evidence must be evaluated cumulatively with the Brady evidence and the evidence of ineffective assistance of counsel and when this is done confidence has been undermined in the reliability of Mr. Pittman’s trial. The Court does not find any reasonable probability that the new evidence argued by the Defendant in this Claim when considered cumulatively along with his other claims of Brady violations and claims of ineffective assistance of counsel would have made a difference in the outcome of the verdict. [This claim] of the Defendant’s Motion is denied.
Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. Specifically, as noted herein, Pittman has failed to show (1) that the State committed any Brady violations; (2) that the asserted newly discovered evidence qualifies as such under Jones v. State, 709 So.2d 512 (Fla.1998); and (3) that trial counsel was ineffective. Whether Pittman’s claims are evaluated individually or cumulatively, Pittman has failed to show that he is entitled to relief under the applicable standards of review.
G. Giglio Claim
In this claim, Pittman asserts that the postconviction court erred in denying his Giglio claim with respect to Carl Hughes and other matters. The United States Supreme Court in Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), held that a prosecutor cannot knowingly present false testimony against a defendant. To establish a Giglio violation, it must be shown that (1) the prosecutor presented false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). Once the defendant establishes the first two prongs, the State bears the burden of showing that the false evidence was immaterial by showing that its use was harmless beyond a reasonable doubt. Id. To do this, the State must show that “there is no reasonable possibility that the error contributed to the conviction.” Id. (quoting State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986)). A court’s decision -with respect to a Giglio claim is a mixed question of law and fact, and a reviewing court will defer to the lower court’s factual findings if they are supported by competent, substantial evidence, but will review the court’s application of law to facts de novo. Sochor v. State, 883 So.2d 766, 785 (Fla.2004).
Pittman asserts that the State knowingly presented false or misleading evidence with respect to Carl Hughes’ testimony that he received no benefit in exchange for his testimony (“I was given no favors”) and that he gave no interviews between June 26, 1990, and September 11, 1990. Pittman asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postcon-viction court ruled as follows:
In his Motion, the defense alleges that State witness, Carl Hughes’s testimony was less than truthful regarding his relationship with the State. The Defendant alleges that Mr. Hughes made statements that he was going to attempt to get statements from Mr. Pittman and that doing so was part of the deal with the State that existed prior to his placement with Mr. Pittman. The Defendant alleges that Mr. Hughes decided not to *812 go through with his testimony but was coerced into doing so when the State threatened to prosecute him and a family member unless he went through with the deal. The defense alleges that an interview Mr. Hughes had with Detective Cosper on July 6, 1990 was never disclosed to the defense. This matter is fully discussed by the Court under Claim I. The Defendant also alleges that the State violated Mr. Pittman’s due process rights by allowing Mr. Hughes to testify that he had been advised by other inmates that Mr. Pittman talked about this case nonstop and indicated to some inmates that he may have done it. The Defendant claims that the State knew that this wasn’t the case; and they failed to disclose that they knew that another inmate, Elton Ard, had indicated that Mr. Pittman had never given an indication that he had killed anyone. The Court does not find that this allegation has any merit, and it was not supported by the defense at the evidentiary hearing.
Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. The court’s factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that the prosecutor presented false testimony and that the prosecutor knew the testimony was false. Under the above standard of review, Pittman has failed to show that the State committed a Giglio violation with respect to this claim.
H. Ineffectiveness Claim
In this claim, Pittman asserts that the postconviction court erred in denying his claim of ineffective assistance of trial counsel with respect to the guilt phase of the trial. Following the United States Supreme Court decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (holding that the Sixth Amendment right to counsel embodies the right to effective assistance of counsel), this Court held that two requirements must be met to satisfy the deficient performance and prejudice prongs of Strickland:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted).
Several additional criteria apply to such claims. First, there is a strong presumption that counsel’s performance was not ineffective. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (“Judicial scrutiny of counsel’s performance must be highly deferential.”). Second, “[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Id. Third, the defendant must “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83(1955)). Specifically, “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have *813 been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone v. State, 768 So.2d 1087, 1048 (Fla.2000).
Because both prongs of the ineffectiveness test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), present mixed questions of law and fact, this Court employs a mixed standard of review. Sochor v. State, 883 So.2d 766, 771 (Fla.2004). The Court will defer to the postconviction court’s factual findings as long as they are supported by competent, substantial evidence in the record, and the Court will review the lower court’s legal conclusions de novo. Id. at 772.
In this claim, Pittman argues that his trial attorneys, Norgard and Trogolo, were ineffective in failing to do the following: in failing to elicit from James Troup the fact that even though there was smoke inside the Toyota when he came upon it on the side of the road, the smoke was not yet coming out of the car; in failing to contact inmate John Schneider in person; in failing to obtain inmate Pounds’ PSI; and in failing to dispute Waters’ level of certainty in identifying the homemade wrecker. This issue was addressed at the evidentia-ry hearing below, and the court addressed it at length its order denying relief. Specifically, with respect to Troup, the court ruled as follows: “The Court does not find that counsel’s performance fell below a reasonable standard with respect to this allegation. To the extent counsel’s failure to elicit the information from Mr. Troup might be considered deficient performance, the Court finds the second prong of the Strickland standard has not been met. There is no reasonable basis to assume that but for such deficient performance, the result of the proceeding would have been different.” With respect to Schneider, the court ruled as follows: “To the extent counsel’s failure to interview Mr. Schneider might be considered deficient performance, the Court finds the second prong of the Strickland standard has not been met. There is no reasonable basis to assume that but for such deficient performance, the result of the proceeding would have been different.” And with respect to this claim overall, the court concluded as follows:
The Defendant has not shown that counsel’s performance fell below an objective standard of reasonableness with respect to the allegations he makes in [this claim] of his Motion. In addition, to the extent it might be argued that there was deficient performance, the Court does not find there is any reasonable probability that the result of the proceedings would have been different but for such deficiencies. [This claim] of Defendant’s motion is denied.
Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. The court’s factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that counsel rendered deficient performance in the guilt phase and that the defendant was thereby prejudiced. Under the above standard of review, Pittman has failed to show that trial counsel was ineffective in this respect.
I. Newly Discovered Evidence Claim
In this claim, Pittman asserts that the postconviction court erred in denying relief on his newly discovered evidence claim. This Court has held that two requirements must be met in order for a conviction to be set aside on the basis of newly discovered evidence: (1) to be considered newly discovered, the asserted evidence must have been unknown to the trial court, to the party, or to counsel at the time of trial, and it must appear that the *814 defendant or defense counsel could not have known of it by the use of due diligence; and (2) the newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial. Jones v. State, 709 So.2d 512, 521 (Fla.1998). To reach this latter conclusion, the trial court is required to consider all newly discovered evidence that would be admissible at trial and then evaluate the weight of both the newly discovered evidence and the evidence that was introduced at trial. With respect to a trial court’s ruling on a newly discovered evidence claim following an evidentiary hearing, as long as the court’s findings are supported by competent, substantial evidence, a reviewing court will not “substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court,” Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997) (quoting Demps v. State, 462 So.2d 1074, 1075 (Fla.1984)), but the court’s application of law to facts is subject to de novo review. Preston v. State, 970 So.2d 789, 798 (Fla.2007).
In this claim, Pittman asserts that newly discovered evidence with respect to investigator Carlos Battles shows that Pittman is entitled to a new trial. He asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postconviction court ruled as follows:
The Defendant raises a claim of newly discovered evidence of innocence with respect to information obtained by Carlos Battles when he was employed by the Department of Children and Family Services as a child protection investigator. At the evidentiary hearing the Defense introduced Mr. Battles’ case file of the investigation as Defense Exhibit 1. In the case file, Mr. Battles listed information that Marie Pittman had told him that Cindy Pittman needs counseling for sexual abuse and that Cindy had witnessed her grandmother being killed by her brother-in-law. At the evidentiary hearing, Mr. Battles testified that this stood out in his mind that the child had witnessed a murder. The defense argues that information that Cindy may have witnessed the murders is inconsistent with the State’s theory of prosecution and consistent with other theories such as Marie and her husband being involved in the murder. The defense argues that Defense Exhibit 1 and the testimony of Mr. Battles is newly discovered evidence under Jones.
This claim of newly discovered evidence involves hearsay statements from Marie Pridgen given to a Mr. Battles in 1998. Cindy Pittman was four years old when her grandparents were murdered in 1990, and the statement Marie made to DCF investigators was eight years after the murders. Mr. Battles testified that he never questioned Cindy about the allegation, and he had no idea if the child actually saw a murder. Detective Cosper testified at the evidentiary hearing that Marie Pittman never told him that Cindy had witnessed the murders. The Court finds no credible basis that this information meets the Jones requirements as newly discovered evidence. In particular, the Court does not find that this evidence is of such a nature that it would probably produce an acquittal on retrial.
Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. Specifically, Pittman has failed to show that the asserted evidence is of such a nature that it would probably produce an acquittal on retrial. See Jones, 709 So.2d at 521. Under the above standard of review, Pittman has failed to show that the *815 asserted evidence meets the Jones standard for newly discovered evidence.
J. Brady Claim Concerning the Penalty Phase
In this claim, Pittman asserts that the State committed a Brady violation by failing to disclose the fact that Pittman’s wife, Marie, told ASA Pickard that Pittman had a crank, or low-grade methamphetamine, problem. He asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postconviction court ruled as follows:
The Court does not believe that the State willfully tried to keep information contained in the notes from the defense and the testimony of Mr. Pickard at the evidentiary hearing indicated that he did make an effort when a deposition was taken of Ms. Pridgen by the defense to tell the defense about things he was going to go into that hadn’t been covered in the deposition.
For a Brady violation to be established it is necessary that the evidence withheld from the defense be of such a material nature that there exists a reasonable probability that the jury verdict would have been different had the suppressed information been used at the trial. None of the information from the notes comes close to being of such a material nature, and the court does not find that the State’s failure to disclose the notes or the information contained in the notes constitutes a Brady violation.
Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. The court’s factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a Brady violation with respect to this claim.
K. Ineffectiveness Claim Concerning the Penalty Phase
In this claim, Pittman asserts that trial counsel was ineffective in the penalty phase in failing to present additional evidence of mental health issues and other mitigation. He asserts that the postcon-viction court erred in denying relief on this claim. He claims that defense counsel was ineffective in the following ways: (1) in failing to present four additional witnesses — Robert Barker, Michael Pittman, Jean Wesley and Tillie Woody — to attest to his substance abuse and life-long afflictions, and (2) in failing to elicit additional information from three witnesses — Tammie Davis, William Pittman, and Dr. Dee — who testified during the penalty phase. This issue was addressed at the evidentiary hearing below and the postcon-viction court addressed it at length in its order denying relief, concluding as follows:
Although the testimony of these witnesses presents a harsh and depressing picture with respect to Mr. Pittman’s childhood, drug use and sexual abuse, the court does not find that the defense has shown that trial counsel’s performance with regard to presenting mental health and other mitigation evidence fell below an objective standard of reasonableness. Dr. Dee testified at trial regarding Mr. Pittman’s mental health issues, drug problems, and sexual abuse. Claim VII of Defendant’s Motion is denied.
*816 Based on this record, we conclude that Pittman has failed to show that the post-conviction court erred in denying this claim. The court’s factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that counsel rendered deficient performance in the penalty phase and that the defendant was thereby prejudiced. Under the above standard of review, Pittman has failed to show that trial counsel was ineffective in this respect.
L. Newly Discovered Evidence Claim Concerning the Penalty Phase
In this claim, Pittman asserts that Dr. Wu’s testimony at the evidentiary hearing concerning the results of a PET scan of Pittman’s brain taken in 2002 constitutes newly discovered evidence that requires a new penalty phase proceeding in light of the following statement in the trial court’s sentencing order: “The expert [Dr. Dee] has offered an opinion as a mitigating circumstance that the Defendant suffers brain damage. Other than this opinion there exists no corroborating evidence to suggest the presence of this damage or its degree, nor its actual relationship to the murders.” At the evidentiary hearing, Dr. Wu testified that the scan results, which show decreased frontal lobe activity, were consistent with Dr. Dee’s trial testimony.
This Court addressed a similar situation in Miller v. State, 926 So.2d 1243 (Fla. 2006):
Finally, Miller argues that the PET scan offers new information. However, Dr. Krop testified at trial that Miller suffered from a frontal-lobe deficiency. Moreover, Dr. Krop testified at the evi-dentiary hearing that the information revealed from the PET scan supported his initial conclusion of a frontal lobe deficiency. Therefore, although the results from the PET scan were not known at the time of the trial, this additional evidence is not the type of evidence that is “of such nature that it would probably produce an acquittal on retrial.” Because it appears that the results would have only corroborated Dr. Krop’s testimony, we deny Miller’s claim.
Miller, 926 So.2d at 1259 (citation omitted) (quoting Scott v. Dugger, 604 So.2d 465, 468 (Fla.1992)). In the present case, the PET scan results of Pittman’s brain taken twelve years after the crime would only have corroborated Dr. Dee’s trial testimony, and this is not the type of evidence that would probably produce a different sentence on remand. On this record, Pittman has failed to show that he is entitled to relief on this claim.[10]
III. HABEAS CORPUS PETITION
A. Whether Appellate Counsel Was Ineffective in Failing to Challenge the Sufficiency of the Evidence
First, claims of ineffective assistance of appellate counsel (IAAC) are properly presented in a petition for writ of habeas corpus. Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the standard for ineffectiveness of trial counsel set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the standard for IAAC has two prongs. A court must determine the following:
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in *817 performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). In raising such a claim, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla.1981). Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. See Rutherford v. Moore, 11A So.2d 637, 643 (Fla.2000). “If a legal issue “would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.” Id. (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla. 1994)).
In this claim, Pittman asserts that the evidence of guilt is insufficient and that appellate counsel was ineffective in failing to raise this issue. This claim, however, warrants no relief. As set forth in the Court’s opinion on direct appeal, the evidence of guilt was clearly sufficient:
A construction worker testified that, when he arrived at work at 6:30 a.m. on the morning of the fire, he noticed a brown Toyota in a ditch on the side of the road near his job site. Other testimony revealed that the location of the Toyota was about one-half mile from the Knowles residence. The worker also observed a homemade wrecker, which he later identified as belonging to Pittman, pull up to the Toyota and, shortly thereafter, saw a cloud of smoke coming from that direction. Another witness who lived near the construction site also saw the smoke and observed a man running away from a burning car. This witness later identified Pittman from a photo-pack as the man she saw that morning. Investigators determined that the car fire, like the earlier house fire, was the work of an arsonist.
At the time of the murders, another of the Knowles’ daughters, Marie, was in the process of divorcing Pittman. The divorce was not amicable and the State introduced testimony that Pittman had made several threats against Marie and her family. The State also produced evidence that Pittman had recently learned that Bonnie Knowles had tried to press criminal charges against him for an alleged rape that had occurred five years earlier.
Carl Hughes, a jailhouse informant, testified that Pittman told him that he had gone to the Knowles’ house on the evening of the murders to speak with Bonnie Knowles about the problems he was having with her family. Bonnie let Pittman in the house and, when she refused his sexual advances, he killed her to stop her cries for help. Pittman then admitted to killing Barbara Knowles in the hallway outside Bonnie’s bedroom and to killing Clarence in the living room as Clarence tried to use the phone. Pittman also told Hughes that he burned the house, stole the Toyota and abandoned it on the side of the road, and later returned to the Toyota and burned it as well.
Pittman, 646 So.2d at 168. Further, in all death cases, this Court independently reviews the record on appeal to assess the legal sufficiency of the evidence, regardless whether the issue was raised, see, e.g., Hojan v. State, 3 So.3d 1204, 1217 (Fla. 2009), and our review of the record on *818 appeal in this case yielded no error in this respect. See Pittman v. State, 646 So.2d 167 (Fla.1994). Thus, because the underlying claim has no merit, appellate counsel cannot be deemed ineffective for failing to raise it. See Groover v. Singletary, 656 So.2d 424, 425 (Fla.1995) (“Appellate counsel’s failure to raise nonmeritorious issues does not constitute ineffective assistance.”).
B. Whether this Court Erred in Affirming the Exclusion of Certain Evidence
In this claim, Pittman asserts that this Court erred in affirming the trial court’s ruling on an evidentiary issue. This Court ruled as follows:
In his third claim, Pittman asserts that the trial court erred by excluding the hearsay testimony of George Hodges, a death row inmate who alleged that his stepson had implicated himself in the Knowles family murders. Early in the trial, the prosecution received an unsolicited letter from Hodges. In this letter, Hodges stated that he had received a letter from his stepson in which the stepson stated that he had killed three people in a failed burglary attempt and that he then burned the house. The trial judge gave defense counsel a few days in which to investigate the allegations. Then, at a hearing on the matter, the judge held that Hodges’ testimony concerning what his stepson had told him was hearsay that did not fit within any exception and was therefore inadmissible. We find that the trial judge correctly excluded Hodges’ testimony as substantive evidence under the hearsay rule and that there is no applicable hearsay exception.
Pittman, 646 So.2d at 171-72 (footnote omitted). Pittman asserts that this ruling is contrary to United States Supreme Court precedent.[11] This claim, however, is procedurally barred. See, e.g., Porter v. Crosby, 840 So.2d 981, 984 (Fla.2008) (“[CJlaims raised in a habeas petition which petitioner has raised in prior proceedings and which have been previously decided on the merits in those proceedings are procedurally barred in the habeas petition.”). A habeas petition is not a second appeal.
C. Whether This Court Erred in Affirming the Convictions and Sentences Where the State Withheld Pertinent Facts
In this claim, Pittman asserts that this Court erred in affirming his convictions and sentences because the State withheld information that was pertinent to his appeal. This claim, however, warrants no relief. First, this claim is procedurally barred. See Smith v. State, 931 So.2d 790, 805 (Fla.2006) (“Smith alleges that he was deprived of due process in his direct appeal because of the State’s failure to disclose facts pertinent to his direct appeal. These claims are procedurally barred because they were or should have been litigated on direct appeal or were or should have been brought in his 3.850 motion.”). And second, on the merits, Pittman has failed to show that the postconviction court erred in rejecting his Brady and Giglio claims, as discussed above.
*819 D. Whether Appellate Counsel Was Ineffective in Failing to Argue that Pittman’s Death Sentences Were Based on an Improper Aggravator
In this claim, Pittman asserts that the trial court erred in finding that the prior violent aggravating circumstance was established by each of the contemporaneous murders. He asserts that appellate counsel was ineffective in failing to raise this claim on appeal. This claim, however, warrants no relief. The underlying issue has already been decided adversely to Pittman. See, e.g., Bevel v. State, 983 So.2d 505, 517 (Fla.2008) (“This Court has repeatedly held that where a defendant is convicted of multiple murders, arising from the same criminal episode, the contemporaneous conviction as to one victim may support the finding of the prior violent felony aggravator as to the murder of another victim”) (quotation marks omitted). Appellate counsel cannot be blamed for failing to raise a meritless claim. See Groover v. Singletary, 656 So.2d 424, 425 (Fla.1995).
E. Whether Appellate Counsel Was Ineffective in Failing to Argue that the Prosecutor Used Improper Argument in the Penalty Phase
The gist of this claim is that the prosecutor made improper comments to the jury during the penalty phase closing argument, and that appellate counsel was ineffective in failing to raise this issue on appeal. This claim, however, warrants no relief. Generally, appellate counsel cannot be deemed ineffective for failing to raise a claim that was not preserved. See, e.g., Johnson v. Singletary, 695 So.2d 263, 266 (Fla.1996) (“[A]ppellate counsel cannot be ineffective for failing to raise claims which were not preserved due to trial counsel’s failure to object”). An exception to this rule is where the alleged error rises to the level of fundamental error. See Owen v. Crosby, 854 So.2d 182, 188 (Fla. 2003). Fundamental error is error that reaches “down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.” Spencer v. State, 842 So.2d 52, 74 (Fla.2003) (quoting Brown v. State, 124 So.2d 481, 484 (Fla.1960)). To constitute fundamental error, improper comments “must be so prejudicial as to taint the jury’s recommended sentence.” Fennie v. State, 855 So.2d 597, 609 (Fla.2003) (quoting Thomas v. State, 748 So.2d 970, 985 n. 10 (Fla.1999)).
In the present case, trial counsel voiced no objection to most of the prosecutor’s comments underlying this claim. None of those comments rise to the level of fundamental error, and appellate counsel cannot be deemed ineffective for failing to raise them on appeal. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) (“If a legal issue ‘would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.”). As to those comments to which counsel did object, to the extent that any of those comments were improper, none was of such a nature as to undermine confidence in the correctness of the result, and appellate counsel cannot be deemed ineffective for failing to raise those comments on appeal.

F.Whether Appellate Counsel Was Ineffective in Failing to Argue that the Penalty Phase Jury Was Misled by Improper Comments and Instructions

The gist of this claim is that the trial court erred in instructing the jury concerning its role in the sentencing process, and appellate counsel was ineffective in failing to raise this issue on appeal. This claim, however, warrants no relief. First, with respect to the underlying claim, *820 it is procedurally barred. See Dufour v. State, 905 So.2d 42, 67 (Fla.2005) (addressing a claim that the trial court’s comments with regard to the advisory role of the jury unconstitutionally minimized the jury’s role in the sentencing process: “a claim of error regarding the instructions given by the trial court should have been presented on direct appeal and is not cognizable through collateral attack”). And second, on the merits, Pittman has failed to show how the judge’s instructions were anything but consistent with Florida’s statutory scheme, and this Court has consistently held that the standard penalty phase jury instructions fully advise the jury of the importance of its role, correctly state the law, and do not denigrate the role of the jury. See Jones v. State, 998 So.2d 573, 590 (Fla.2008); Miller v. State 926 So.2d 1243, 1257 (Fla.2006); Perez v. State, 919 So.2d 347, 368 (Fla.2005); Card v. State, 803 So.2d 613, 628 (Fla.2001); Brown v. State, 721 So.2d 274, 283 (Fla.1998). Appellate counsel cannot be deemed ineffective in failing to raise a nonmeritorious claim. See Peede v. State, 955 So.2d 480, 503 (Fla.2007).[12]
IV. CONCLUSION
Based on the foregoing, we affirm the postconviction court’s order denying Pittman’s rule 3.850 motion, and we deny his habeas petition.
It is so ordered.
LEWIS, POLSTON, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs in result with an opinion.
CANADY, C.J., concurs in result.
QUINCE, J., recused.

. Specifically, die trial court’s findings with respect to mitigating circumstances were as follows:
As to mitigating circumstances, the Court finds the following:
1. That the three First Degree Murders for which the Defendant is to be sentenced were not committed while the Defendant was under the influence of extreme mental or emotional disturbances, nor were they mitigated by the use of alcohol as suggest *801 ed. To the contrary, the Court finds the Defendant [a] arranged the visit to his father’s house on the eve of the murders, the first time in months that he had been to his father's house; [b] that he left the house by an outside door from a locked room; [c] walked the short distance in the early morning hours to the victim’s home; and [d] there cut the telephone lines to the outside of the house.
The Defendant upon entering the victim’s home, systematically killed all the occupants of the house using a weapon that assured the least possibility of drawing the attention of witnesses. He then proceeded in a knowledgeable way to pour gasoline about the house and out into the yard. Testimony at the trial revealed that he understood the use of fire to destroy evidence. Before setting the fire, however, he secured the keys to Bonnie Knowles car for the purpose of his getaway.
The Defendant’s actions and all other evi-dentiary circumstances considered show a direct conscious plan to kill and avoid apprehension. These actions do not indicate a person functioning under the influence of extreme mental or emotional disturbances. In regard to the influence of alcohol, other than the expert’s opinion, the record does not reflect it to have been a factor in the commission of the murders.
2.Except for the solicited opinions of the Defendant’s expert that the Defendant’s capacity to conform his conduct to the requirements of the law was substantially impaired, this mitigating circumstance is unsupported by any other evidence in the record.
To the contrary, these facts reveal that all the actions by the Defendant leading up to the killings, the nature of the killings themselves, the methodical steps taken to destroy evidence, to effectuate a getaway, and to establish an alibi were the product of deliberate thought. These actions clearly show that the Defendant knew what he was doing and that it was unlawful. Again the presence of alcohol as a mitigating factor is unsupported by the record except for the expert's opinion.
THE COURT finds there is nothing in the record to demonstrate that the Defendant could not conform his conduct to the requirements of law.
3. The expert has offered an opinion as a mitigating circumstance that the Defendant suffers brain damage. Other than this opinion there exists no corroborating evidence to suggest the presence of this damage or its degree, nor its actual relationship to the murders.
4. Additional mitigating circumstances offered in evidence are that the Defendant was and may still be a hyperactive personality, and that he may have suffered physical and sexual abuse as a child. Also the expert testified that the Defendant was an impulsive person with memory problems and impaired social judgment.
Taking all these mitigating circumstances in a light most favorable to the Defendant, the Court finds they have little if any connection to the murders. The record speaks clearly of an individual who went about the killings and the destruction of evidence in a deliberate, methodical and efficient manner to such an extent that detection was nearly avoided. But for a lady picking roses early one morning who happened to see the Defendant running from Bonnie Knowles’ burning car, the case might not have been successfully prosecuted.
While addressing meaningful facts, the record reflects another that enlightens upon the issues of the Defendant's intentions and his capacity to understand what he was doing was unlawful. That fact was the Defendant’s cutting of the telephone lines. This was admitted by the Defendant to witness Hughes as being done before the Defendant entered the home of the victims.
THE COURT, therefore, finds the aggravating circumstances established by the proper burden of proof to substantially outweigh all mitigating circumstances reflected in the record.
Pittman v. State, 646 So.2d 167, 169 n. 2 (Fla.1994).

. The issues, as set forth in the Court’s opinion on direct appeal, were as follows;
The issues are as follows: (1) whether the trial court erred in allowing evidence of *802 collateral crimes and bad acts; (2) whether the trial court erred in admitting identification testimony; (3) whether the trial court erred in excluding hearsay statements of a third party’s alleged confession; (4) whether the trial court failed to hold a presen-tencing hearing; (5) whether the trial court rendered a legally insufficient sentencing order; (6) whether the heinous, atrocious or cruel aggravating circumstance is unconstitutionally vague; (7) whether the trial court erred in instructing the jury on the heinous, atrocious or cruel aggravating circumstance; (8) whether the trial court erred in failing to find the two statutory mental mitigating circumstances; (9) whether the trial court erred in failing to find nonstatutory mitigating circumstances; (10) whether the death penalty is disproportionate in this case.
Pittman, 646 So.2d at 170 n. 3.

. Huff v. State, 622 So.2d 982 (Fla. 1993).

. Those claims, as denoted in the postconviction court’s order denying relief, were as follows: (1) Pittman was deprived of his rights because either the State failed to disclose evidence that was material and exculpatory or knowingly presented misleading evidence, or defense counsel unreasonably failed to discover and present exculpatory evidence, or the favorable evidence constitutes newly discovered evidence; (2) Pittman was deprived of his rights because either the State withheld evidence that was material and exculpatory in nature or presented misleading and false evidence, or defense counsel unreasonably failed to discover and present exculpatory evidence, or the favorable evidence constitutes newly discovered evidence; (3) Pittman was denied effective assistance of counsel in the guilt phase of the trial in that counsel failed to effectively investigate and prepare the case and failed to effectively challenge the testimony of a crucial state witness; and (7) Pittman was denied effective assistance of counsel in the sentencing phase of the trial in that counsel was rendered ineffective by the trial court’s and State’s actions, counsel failed to adequately investigate and prepare mitigating evidence, failed to provide the mental health experts with this mitigation, and failed to adequately challenge the State’s case, and counsel failed to adequately object to Eighth Amendment error.

.At the evidentiary hearing, the following witnesses testified for the defense: Carlos Battles, who was previously a child protective investigator with the Florida Department of Children and Families, testified concerning his investigation of Cindy Pittman whose mother told Battles that the child had witnessed her grandmother being killed by her "brother-in-law” or by her “uncle”; Thomas Cosper, who was previously a homicide detective for the Polk County Sheriff’s Office, testified concerning various defense exhibits; Kathleen Anders, the ex-wife of inmate Carl Hughes, testified concerning statements that Hughes had made to her concerning the Pittman case; Dennis Gerald Waters testified concerning his trial testimony with respect to a disabled auto that he had seen on the side of the road and a wrecker he seen in the vicinity; James Troup testified concerning his trial testimony with respect to a burning auto he had seen on the side of the road; Tillie Amos Woody, a retired school teacher, testified concerning Pittman’s behavior as a student in middle school; Robert Barker testified that when Pittman was young he spent a lot of time at a junkyard Barker owned and later worked for Barker; Dr. Wu, a medical doctor, testified concerning the results of a PET scan of Pittman's brain; Jean Wesley, a teacher, testified concerning Pittman’s performance in her class for emotionally handicapped and autistic children when Pittman was eleven or twelve years old; Michael Eugene Pittman, David's half brother, testified concerning David's life as a young child and teenager; Tammie Lynn Davis, who was five to seven years younger than David and was practically raised by David's mother and who testified at trial, testified concerning David's life as a teenager and young adult and certain events surrounding the murders; William Pittman, who is David’s half brother and who testified *803 at trial, testified concerning David’s drug use and sexual abuse at the hands of an employer; Dr. Dee, a clinical psychologist and clinical neuropsychologist and who testified at trial, testified concerning the status of David’s mental health; Hardy Pickard, an assistant state attorney who worked on the Pittman case, testified at length concerning various matters relating to the case; Raymond Reyome, a former inmate who was in jail pod 227 with Pittman, testified that he never saw Pittman discussing his case with anyone; David Pounds, a former jail inmate who was in the pod with Pittman and who testified at trial, testified that he, Pounds, was mentally ill at the relevant time and that he now has no memory of Pittman talking to him; John Thomas Schneider testified that he was a jail inmate in pod 227 with both Pittman and Carl Hughes and that Pittman kept his legal papers under the bed Hughes slept on and that Schneider saw Hughes reading the papers and writing things down and when he confronted Hughes about it Hughes said that Pittman had given him permission and that one night while Pittman was sleeping Hughes was reading his papers and Schneider woke Pittman and told him and that Schneider and Hughes then got into a fight because Hughes denied saying that Pittman had given him permission and that after the fight Hughes was transferred out of the pod; and Robert Norgard, Pittman’s trial counsel, testified at length concerning various matters relating to the case.
The following witness testified for the State; Martin Hodges, an investigator for the state attorney's office, testified that he interviewed Pounds prior to the evidentiary hearing, and that Pounds said he had been planning on changing his testimony because he did not believe in the death penalty and because he felt sorry for Pittman, but that he had decided against it because he would be lying and he did not want it to come back on him and that he had testified truthfully at trial.

. At the evidentiary hearing, the following witnesses testified for the defense; Hardy Pickard, an assistant state attorney (ASA) who had worked on the Pittman case, testified concerning his notes with respect to Barbara Marie Pridgen, David Pittman’s ex-wife; and Robert Norgard, Pittman’s trial counsel, testified that Pickard’s notes concerning Marie were never disclosed to him.

. At the evidentiary hearing, the following witnesses testified for the defense: Chastity Eagan, whose mother lived with Marie Prid-gen for more than a year, testified that Marie did not act upset that her mother, father and sister had been killed but rather said she was glad they were dead because they had been working with a state agency to take her kids from her and that Marie had received some money after their deaths and had gone on a spending spree and that David Pridgen had said he killed three people; Rosa Greenbaum, a criminal defense investigator, testified that she had tried to locate Chastity Eagan before the July 2006 evidentiary hearing but that Ms. Eagan's probation officer did not know where she could be located; and David Wayne Prid-gen testified that he was at Fort Bragg, North Carolina, when the murders took place and that he did not recall telling Ms. Eagan that he had killed three people but that he may have been referring to his tour of duty in the Gulf War.
The following witness testified for the State: John Van Shuman, a friend of David Prid-gen’s, testified that he had never heard David say that he killed three people.

. Pittman raises the following guilt phase claims in his present appeal: (1) whether the postconviction court erred in denying his claim under Brady v. Maryland, 373 U.S. 83, *804 83 S.Ct. 1194, 10 L.Ed.2d 215(1963), with respect to inmate Carl Hughes; (2) whether the postconviction court erred in denying his Brady claim with respect to inmate David Pounds; (3) whether the postconviction court erred in denying his Brady claim with respect to the handwritten notes of other witness interviews; (4) whether the postconviction court erred in denying his Brady claim with respect to Dennis Waters' identification of the wrecker; (5) whether the postconviction court erred in denying his Brady claim with respect to the letter concerning William Smith; (6) whether the postconviction court erred in denying relief based on the cumulative effect of all the withheld and newly discovered evidence; (7) whether the postcon-viction court erred in denying his Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), claim; (8) whether the postconviction court erred in denying his ineffective assistance of counsel claim; and (9) whether the postconviction court erred in denying his newly discovered evidence claim.
Pittman also raises the following penalty phase claims: (10) whether the postconviction court erred in denying his Brady claim; (11) whether the postconviction court erred in denying his ineffective assistance of counsel claim; and (12) whether the postconviction court erred in denying his newly discovered evidence claim.

. Pittman raises the following claims in his present habeas petition: (1) whether appellate counsel was ineffective in failing to challenge the sufficiency of the evidence; (2) whether the Florida Supreme Court erred in affirming the exclusion of certain evidence; (3) whether the Florida Supreme Court erred in affirming Pittman's convictions and sentences where the State withheld pertinent facts; (4) whether appellate counsel was ineffective in failing to argue that Pittman’s death sentences were based on an improper aggravator; (5) whether appellate counsel was ineffective in failing to argue that the prosecutor used improper argument in the penalty phase; and (6) whether appellate counsel was ineffective in failing to argue that the penalty phase jury was misled by improper comments and instructions.

. To the extent Pittman raises any other claims or subclaims with respect to the denial of his rule 3.850 motion, we find those claims and subclaims to be without merit.

. Pittman cites two cases to support this claim: Holmes v. South Carolina, 547 U.S. 319, 319-20, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (holding that a defendant's rights are "abridged by evidence rules that infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve”), and Williamson v. United States, 512 U.S. 594, 600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (holding that whereas a statement against interest is admissible under the federal hearsay rule, a hearsay statement that is collateral to a statement against interest is not admissible).

. To the extent Pittman raises any other claims or subclaims with respect to his habe-as corpus petition, we find those claims and subclaims to be without merit.