[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11807

_____

D.C. Docket No. 8:12-cv-01600-EAK-EAJ

DAVID JOSEPH PITTMAN,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 22, 2017)

Before MARCUS, JORDAN, and JULIE CARNES, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, David Joseph Pittman, a state prisoner in Florida convicted of the 1990 murder of Barbara, Clarence, and Bonnie Knowles, seeks federal habeas relief pursuant to 28 U.S.C. § 2254. Following a 9-3 recommendation by the jury in favor of death, the state trial court sentenced Pittman to death for each of the three murders. The judgment was upheld by the Florida Supreme Court on direct appeal and again on collateral review. Pittman v. State, 646 So. 2d 167, 168 (Fla. 1994) (Pittman I); Pittman v. State, 90 So. 3d 794, 799 (Fla. 2011) (Pittman II). Pittman now claims that the state trial court erred in excluding evidence related to an alternative perpetrator for the killings in violation of his right to present a meaningful defense as explicated by the Supreme Court in Chambers v. Mississippi, 410 U.S. 284 (1973), and that his counsel was ineffective during the penalty phase of the trial in violation of Strickland v. Washington, 466 U.S. 668 (1984). The district court issued a comprehensive opinion denying all relief. After carefully reviewing the record and with the benefit of oral argument, we affirm.

## I.

## A.

The essential facts as drawn by the Florida Supreme Court on direct appeal are these: Just after 3 a.m. on May 15, 1990, a newspaper deliveryman in Mulberry, Florida, reported that he had seen a burst of flame on the horizon. When

the authorities arrived they found the home of Clarence and Barbara Knowles

engulfed in flame.  After the fire had been extinguished, the police entered the

house and found the bodies of Clarence and Barbara Knowles along with the body

of their twenty-year-old daughter, Bonnie.  A medical examiner determined that

the Knowles family had died not from the fire but from massive bleeding resulting

from multiple stab wounds. Bonnie Knowles' throat had been cut.  An investigator

also determined that the fire was the result of arson, that the phone line to the

house had been cut, and that Bonnie Knowles' brown Toyota was missing.

At 6:30 a.m. on the morning after the fire, a construction worker noticed a

brown Toyota in a ditch on the side of the road near his job site about one-half mile

from the Knowles residence. A few minutes later, the worker saw a homemade

wrecker -- which he later identified as belonging to Pittman -- pull up to the Toyota

and, shortly thereafter, a cloud of smoke arose from the vehicle.  Another witness

who lived near the construction site saw a man running away from the burning car.

She identified Pittman from a photo array as the man she saw that morning.

Pittman knew the Knowles well.  At the time of the murders, another of the

Knowles' daughters, Marie, was going through a contentious divorce with Pittman.

During the process, Pittman had made several threats against Marie and her family.

Adding to the strain, Pittman had recently discovered that Bonnie Knowles was

attempting to press criminal charges against him for an alleged rape that had

3

occurred five years earlier.

Carl Hughes, a jailhouse informant, testified that Pittman had confessed to him that he committed the murders. As Pittman told it, he went to the Knowles' house intending to speak with Bonnie Knowles. She let Pittman in and they talked, but when Bonnie resisted his sexual advances, he killed her in order to stop her cries for help. Pittman then murdered Bonnie's mother, Barbara Knowles, in the hallway outside Bonnie's bedroom and then killed Clarence Knowles as the father tried to use the phone to call for help. Hughes said that Pittman also admitted to burning down the house and stealing the Toyota before setting it aflame. Pittman I, 646 So. 2d at 168.

David Pittman was charged with the murders of Clarence, Barbara, and Bonnie Knowles, grand theft, burglary, and arson. He was represented by Robert Norgard and Robert Trogolo of the public defender's office and proceeded to trial. As relevant here, midway through the state's case in chief, defense counsel brought to the trial court's attention a letter that had been sent to the prosecutor on the case. In the letter, a prisoner named George Hodges claimed that his stepson, Jessie Watson, sent him a letter -- which Hodges had since destroyed -- in which Watson confessed to murdering three people in a house in Mulberry along with his cousin, Aaron Gibbons. At the time of Pittman's trial, Hodges was on death row for the murder of a convenience store clerk in Plant City, Florida. Watson had initially

4

served as an alibi witness for Hodges, but at trial he changed his story and became a key witness for the prosecution. Watson testified that not only was Hodges lying about the alibi, Hodges had also confessed to Watson that Hodges had committed the murder. Notably, Hodges explained that he destroyed the letter on the advice of another inmate because he thought it was just a joke and it would only cause him trouble.

At the time defense counsel raised the Hodges issue, Marie Pridgeon -- Pittman's ex-wife and a potential alternative perpetrator under the defense's theory of the case -- was on the stand. Defense counsel asked for time to investigate the allegations in the letter before moving forward with the cross examination so the defense would not be put in the position of presenting inconsistent defense theories were the investigation to reveal evidence to substantiate Watson's involvement. The court, the prosecutor, and defense counsel all agreed that the best course of action was to put off further examination of Pridgeon until the following Monday in order to give investigators from the public defender's office time to follow up on any leads and allow the attorneys to participate in the investigation over the weekend.

When defense counsel reported back to the court, the defense had identified both Watson and Gibbons and confirmed they used crack cocaine together and lived less than a mile from where witnesses had seen the wrecker at issue in the

5

case. Gibbons's grandmother, who Gibbons was known to stay with, lived near the site of the murders. From pictures of Gibbons, defense counsel learned that he had very bad acne, which aligned with a witness description of the man running away from Bonnie's burning car. Defense counsel also discovered that Gibbons knew Bonnie Knowles and there were rumors that he had dated her and used to sneak into her bedroom at night to see her. Gibbons reported that he was at home on the night of the murder, but had no independent verification of his alibi. Defense counsel asked the court to give them until Wednesday, April 10 to follow up on these leads and for the court to have the state transport Michael Bedford, another inmate who claimed to have seen the letter from Watson, so that he could be questioned. Again, the court granted the defendant's requests.

When they returned on Wednesday, defense counsel reported that they had uncovered additional information that undercut Gibbons's credibility. Gibbons had denied being involved in a burglary with Hodges and Watson when interviewed by the police, but at his later deposition he admitted that this was a lie. Gibbons also admitted to being involved in the theft of a boat motor after which he burned the boat to cover any fingerprints. Bedford had also confirmed Hodges's story about the letter. Based on these additional pieces of information, the defendant asked for and was granted a further continuance until Friday, April 12.

6

On Monday, April 15, the court heard arguments on whether to allow Hodges to testify as to the content of the now-destroyed letter from Watson. The state argued that Hodges's testimony about the contents of the letter was hearsay which did not fall under any exception and that the testimony had insufficient indicia of trustworthiness and reliability. In addition to the inherent shakiness of the defense evidence, the prosecution pointed to Watson's unequivocal denial that he had written the letter and evidence that Watson had been at work at 7 a.m. on the morning after the murder, when there was testimony that the car was burned some distance away at 6:40 a.m.

The defendant, in turn, argued that Chambers v. Mississippi, 410 U.S. 284, 302 (1973), required allowing the testimony notwithstanding any Florida evidentiary rule to the contrary because the information they had found in their investigation sufficiently corroborated the letter so that Hodges should be able to testify about its contents. Ultimately, the trial court excluded Hodges' testimony. The trial court read Chambers as prohibiting the exclusion of critical defense evidence only when there was "considerable assurance of [the evidence's] reliability." And because the court found that the evidence lacked this sort of corroboration or any other indicia of trustworthiness, the testimony was inadmissible.

7

After the close of the evidence, the jury returned a verdict of guilty as to each of the three counts of first-degree murder, two counts of arson, and one count of grand theft.  The trial court then moved straight into the penalty phase.

B.

At sentencing, the State offered as statutory aggravators under Florida law that Pittman had a prior conviction for a felony involving a threat of violence, that the murders of Clarence and Barbara Knowles were committed for the purpose of avoiding lawful arrest, and that each of the murders were heinous, atrocious, and cruel.  The State primarily relied on its guilt phase evidence to support these aggravators, but did call one witness to substantiate Pittman's prior conviction for a crime involving a threat of violence.

Defense counsel presented an elaborate and substantial body of mitigation testimony from seven family members -- Freddy Joe Farmer, Bill Pittman, Nina Jane Farmer, Barbara Ann Farmer, Eugene Pittman, Bobbi Jo Pittman, and Francis Marie Pittman.  Among other things, the family members testified that Pittman had difficulty at school and was a slow learner.  Indeed, Pittman was never able to succeed in school -- his normal grade was an F and a high grade for him would be a D. Despite these grades, he was socially promoted each year until he reached the ninth grade.  Moreover, Pittman was hyperactive and impulsive.  Pittman's stepfather testified that he was called to pick up Pittman on the first day of first

8

grade because he was disrupting the class. His mother described him as "[a] very rambunctious little boy," "a child most women would not want to have to raise."

His parents knew about these problems but were simply too poor and dysfunctional to deal with them effectively. Thus, for example, they took Pittman to a psychiatrist when he was ten or eleven years old. Pittman saw the psychiatrist four or five times, but the family had to discontinue both the visits and the Ritalin the psychiatrist prescribed because they didn't have the money to pay for them. Pittman's parents also offered testimony at the penalty phase about head injuries Pittman had suffered as a child that may have compounded his problems. Both parents recalled Pittman being hit in the head with either a brick or a rock. His mother also testified regarding an incident when Pittman was six years old and passed out while trying to syphon gasoline out of an old car with a hose.

Defense counsel also established from multiple witnesses, including Pittman's mother and father, his aunt and uncle, his stepbrother, and his sister, that Pittman's mother was physically and verbally abusive with her children, and the witnesses generally agreed that Pittman got it worse than his siblings. In fact, his mother admitted to whipping him with a belt starting when he was 4 years old. She recalled that she had spanked him "every day, every other day" and that she "beat the shit out of him" with a belt. She testified that she also used broom handles to inflict punishment on the petitioner. Her husband told her at one point that she

9

"was going to have to quit breaking the brooms because he was having to buy one a week." She also said that she whipped her children with hot wheel tracks because "[y]ou can take a little hot wheels track and it will never blister, never bruise," and wouldn't leave any marks. She used other forms of discipline as well. After Pittman admitted to spilling a can of oak stain in a newly redone room, his mother made him remain on a bench in a corner of the kitchen for seven days straight, leaving only to use the rest room. Indeed, when asked whether she ever worried about child services being called, she gave this chilling response:

> I would give them their little whippings and I'd sit the phone right in the middle of the floor and say, "If you want to call them, call them. They may put me in jail and I may have to spend the night, but sooner or later they're going to let me out. And when they let me out you're going to the hospital. If you want to put me in jail, fine."

The remainder of defense counsel's extensive penalty phase presentation came from Dr. Henry Dee, a clinical psychologist who specialized in clinical neuropsychology and child psychology. He held a master's degree in physiological psychology and a doctorate in clinical neuropsychology, both from the University of Iowa. After completing his doctorate, Dr. Dee remained at the University of Iowa for five years of residency and a professorship. He had also been a senior consultant on head injuries for the Veteran's Administration during the Vietnam War. After leaving the University of Iowa and returning to Florida he worked in private practice as a psychologist and consulted with child protective

10

services in the area.  At the time of the Pittman trial, he had testified as an expert in over 1000 cases.

Dr. Dee opined that Pittman suffered from a severe form of attention deficit disorder with hyperactivity.  He explained that this meant Pittman was overactive as a child, was easily distracted, had an extreme need for attention, and had difficulties with inhibition.  These qualities caused him to encounter difficulty when dealing with authority figures and resulted in him acting out to receive attention.  These problems, combined with Pittman's reading disability, led the family to mistakenly conclude that he was "simply a disruptive child who wasn't very bright," when in reality he was a child with "normal intellectual endowment" suffering from a combination of a severe psychological disorder and a learning disability.

Dr. Dee concluded Pittman's conduct was symptomatic of organic brain damage.  The testimony from Pittman's mother and father that the petitioner reached developmental milestones at a late age (e.g. learning to talk at age 4) led Dr. Dee to conclude that the damage was at least partly congenital.  Dr. Dee offered that this congenital brain damage was worsened by significant head injuries as a child and ingestion of toxic substances.

Pittman's psychological assessment scores also suggested the presence of organic brain damage.  For example, while he had a full scale IQ of 95 -- only

slightly below average -- he had a full scale memory quotient of 65 -- which was below 99 percent of the population.  Similarly, while Pittman performed adequately on a general test of verbal function, he performed in the second percentile on a test that asked him to give all the words he could think of that began with a particular letter of the alphabet. Dr. Dee explained that these dramatic inconsistencies were indicative of organic brain damage.

He added that Pittman's brain damage manifested itself later in life in mood instability evincing moods that swung wildly and were "frequently all out of proportion to what is going on," severe paranoid ideation, and recurrent episodes of extreme aggression and rage.  Pittman also displayed symptoms of severe apathy and indifference and impaired social judgment. The brain damage and abuse was particularly troubling because of the mental health problems found in Pittman's family.  Pittman's biological father had been diagnosed as a paranoid schizophrenic and died in a mental institution, and he had another son -- Pittman's half-brother -- who was a paranoid schizophrenic as well.  Further testing indicated that Pittman was addicted to alcohol or some other major psychoactive substance.

Dr. Dee explained that he thought the family was "almost totally dysfunctional."  He said that he had never heard a family member admit to as much physical abuse as Pittman's mother did on the stand, and that he believed there was "much more."  Dr. Dee also testified that Pittman said that he had been

12

raped three or four times when he was only eight or nine years old by one man and on two other occasions by another man. Dr. Dee further explained that this sort of abuse was consonant with Pittman's "super macho, nothing can hurt me, take any kind of risk" behavior later in life.

Connecting these facts to the offense, Dr. Dee opined that Pittman was under great psychological stress at the time of the murders. He was going through a difficult divorce, and he was under federal investigation for large equipment theft. Pittman had come to see himself as persecuted -- "anytime anything went wrong they came looking for David Pittman, no matter what the crime." He also drank at least two to four beers that evening, further compounding his problems with a lack of inhibition. In Dr. Dee's view the combination of these stressors -- the alcohol and the organic brain damage -- would have made Pittman borderline psychotic, to an extent that he lost touch with reality. He added that Pittman's ability to conform his behavior to the law would have been severely impaired.

Dr. Dee summarized his view of the mitigating evidence this way:

> [A]t the time of the commission of the crime Mr. Pittman suffered major mental and emotional disturbance as is evidenced both by impairment in cognitive function, that is, memory impairment, and other scattered findings, and difficulties in emotional control. That would make it much more difficult for him to adequately conform his conduct to the standards of the law. I view as nonstatutory mitigation in this case a childhood replete with abuse, both physical and sexual, mostly physical, but significantly sexual. The failure of his parents and the school system to recognize what was wrong with him and to provide him with a more prosthetic environment, that is, an

13

environment in which . . . to grow so that he could become a useful member of society simply was never provided.

Finally, Dr. Dee testified that Pittman was not beyond redemption; rather, Dr. Dee believed Pittman's psychological problems could be managed through a combination of medication and psychological counseling.

Notwithstanding this powerful presentation of mitigating evidence, the jury recommended by a vote of 9-3 that Pittman receive the death penalty for each of the three murders.  In its sentencing order, the trial court found as aggravating circumstances that each murder was heinous, atrocious, and cruel, Fla. Stat. § 921.141(6)(h); that Pittman had committed the murders having a previous conviction for a felony involving a threat of violence, Fla. Stat. § 921.141(6)(b); and that the murders were committed after Pittman had committed two previous capital felonies, Fla. Stat. § 921.141(6)(b) -- i.e. the other two murders.[1]   Pittman

---

[1] In its sentencing order, the trial court specifically found the following:

> 1. As an aggravating circumstance, the Defendant, David Joseph Pittman, was proven beyond and to the exclusion of every reasonable doubt to have a previous conviction of a felony involving the use or threat of violence; to wit: Aggravated Assault. (Case No. CF85–3584A1—Sentenced on March 12, 1986.)

> 2. As an aggravating circumstance, the Defendant, David Joseph Pittman, was proven beyond and to the exclusion of every reasonable doubt to have committed two previous capital felonies as to each of the three murders for which he has been found guilty; to wit: the murders of Bonnie Knowles and Barbara Knowles as to the murder of Clarence Knowles; the murders of Barbara Knowles and Clarence Knowles as to the murder of Bonnie Knowles; the murders of Clarence Knowles and Bonnie Knowles as to the murder of Barbara Knowles.

I, 646 So. 2d at 169 n.1.  As for mitigating circumstances, the trial court

determined that they had little if any connection to the homicides and that they

---

3. As an aggravating circumstance, the commission of the First Degree Murder of Bonnie Knowles was especially heinous, atrocious or cruel.

By testimony and evidence in the record the court finds that the State proved beyond and to the exclusion of all reasonable doubt that Bonnie Knowles experienced conscious pain and suffering before death as a result of the Defendant cutting and stabbing Bonnie Knowles numerous times with a knife or similar object.

4. As an aggravating circumstance, the commission of the First Degree Murder of Barbara Knowles was especially heinous, atrocious or cruel.

By the testimony and evidence in the record the Court finds that the State proved beyond and to the exclusion of every reasonable doubt that Barbara Knowles [a] experienced pre-death apprehension of physical pain; [b] experienced conscious pain and suffering before death as a result of the Defendant stabbing Barbara Knowles numerous times with a knife or similar object; and [c] that she experienced apprehension of impending death even absent physical pain.

5. As an aggravating circumstance, the commission of First Degree Murder of Clarence Knowles was especially heinous, atrocious or cruel.

By testimony and evidence in the record the Court finds that the State proved beyond and to the exclusion of every reasonable doubt that Clarence Knowles [a] experienced pre-death apprehension of physical pain; [b] experienced apprehension of death even absent physical pain; and [c] experienced conscious pain and suffering before death as a result of the Defendant stabbing Clarence Knowles numerous times with a knife or similar object.

THE COURT concludes from these facts that David Joseph Pittman's actions in murdering each of the three individuals was especially heinous, meaning extremely wicked or shockingly evil; was especially atrocious, meaning outrageously wicked or vile; and was especially cruel, meaning designed to inflict a high degree of pain with utter indifference to, or even with enjoyment of, the suffering of others.

Pittman I, 646 So. 2d at 169 n.1.

15

were outweighed by the aggravators in the case.[2]  Pittman I, 646 So. 2d at 169 n.2.

Based on these findings, the trial court imposed a sentence of death for each of the

three murders.  Id. at 169.

---

[2] The trial court explained its findings this way:

> 1. That the three First Degree Murders for which the Defendant is to be sentenced were not committed while the Defendant was under the influence of extreme mental or emotional disturbances, nor were they mitigated by the use of alcohol as suggested. To the contrary, the Court finds the Defendant [a] arranged the visit to his father's house on the eve of the murders, the first time in months that he had been to his father's house; [b] that he left the house by an outside door from a locked room; [c] walked the short distance in the early morning hours to the victim's home; and [d] there cut the telephone lines to the outside of the house.
>
> The Defendant upon entering the victim's home, systematically killed all the occupants of the house using a weapon that assured the least possibility of drawing the attention of witnesses. He then proceeded in a knowledgeable way to pour gasoline about the house and out into the yard. Testimony at the trial revealed that he understood the use of fire to destroy evidence. Before setting the fire, however, he secured the keys to Bonnie Knowles['] car for the purpose of his getaway.
>
> The Defendant's actions and all other evidentiary circumstances considered show a direct conscious plan to kill and avoid apprehension. These actions do not indicate a person functioning under the influence of extreme mental or emotional disturbances. In regard to the influence of alcohol, other than the expert's opinion, the record does not reflect it to have been a factor in the commission of the murders.
>
> 2. Except for the solicited opinions of the Defendant's expert that the Defendant's capacity to conform his conduct to the requirements of the law was substantially impaired, this mitigating circumstance is unsupported by any other evidence in the record.
>
> To the contrary, these facts reveal that all the actions by the Defendant leading up to the killings, the nature of the killings themselves, the methodical steps taken to destroy evidence, to effectuate a getaway, and to establish an alibi were the product of deliberate thought. These actions clearly show that the Defendant knew what he was doing and that it was unlawful. Again the presence of alcohol as a mitigating factor is unsupported by the record except for the expert's opinion.

C.

After conviction, Pittman appealed the judgment to the Florida Supreme

Court.  In his brief, he again argued that the trial court's exclusion of Hodges's

testimony violated his right to due process as set forth in Chambers.  The Florida

Supreme Court denied his appeal.  Pittman I, 646 So. 2d at 171–72.  Pittman later

challenged his convictions and sentences collaterally.  He filed a state habeas

---

THE COURT finds there is nothing in the record to demonstrate that the Defendant could not conform his conduct to the requirements of law.

3. The expert has offered an opinion as a mitigating circumstance that the Defendant suffers brain damage. Other than this opinion there exists no corroborating evidence to suggest the presence of this damage or its degree, nor its actual relationship to the murders.

4. Additional mitigating circumstances offered in evidence are that the Defendant was and may still be a hyperactive personality, and that he may have suffered physical and sexual abuse as a child. Also the expert testified that the Defendant was an impulsive person with memory problems and impaired social judgment.

Taking all these mitigating circumstances in a light most favorable to the Defendant, the Court finds they have little if any connection to the murders. The record speaks clearly of an individual who went about the killings and the destruction of evidence in a deliberate, methodical and efficient manner to such an extent that detection was nearly avoided. But for a lady picking roses early one morning who happened to see the Defendant running from Bonnie Knowles' burning car, the case might not have been successfully prosecuted.

While addressing meaningful facts, the record reflects another that enlightens upon the issues of the Defendant's intentions and his capacity to understand what he was doing was unlawful. That fact was the Defendant's cutting of the telephone lines. This was admitted by the Defendant to witness Hughes as being done before the Defendant entered the home of the victims.

THE COURT, therefore, finds the aggravating circumstances established by the proper burden of proof to substantially outweigh all mitigating circumstances reflected in the record.

Pittman I, 646 So. 2d at 169 n.2.

17

petition directly with the Florida Supreme Court raising his challenge to the exclusion of the Hodges testimony.  He also filed a Rule 3.850 motion raising several claims, including ineffective assistance of counsel, in the postconviction trial court.

The postconviction trial court granted an evidentiary hearing on Pittman's claim that he was afforded ineffective assistance of counsel during the penalty phase.  As for this claim, Pittman put on testimony from several new witnesses, and attempted to elicit additional information from a few witnesses who testified during the trial.

First, Pittman offered testimony from two of his teachers, Tillie Woody and Jean Wesley, both of whom had been interviewed by Pittman's original trial team but had not been asked to testify at the penalty phase.  They observed that Pittman was not successful in school but, notably, did not have any significant behavior problems.  Pittman also introduced additional evidence concerning his substance abuse, and the physical and sexual abuse he sustained as a child.  For example, Robert Barker, his former boss, testified that he "huffed a lot of gas," drank gas with milk, and used crack cocaine.  Michael Pittman, Pittman's younger brother, testified that he thought Pittman had likely been sexually abused by a group of older neighborhood kids and by a babysitter and that Pittman had used amphetamines and huffed gasoline as a teenager.  Bill Pittman, still another of the

18

petitioner's brothers, confirmed that Pittman used methamphetamine and testified that Pittman had been molested by the owner of the gas station where he worked.

Dr. Henry Dee also testified at the collateral hearing. After listening to the earlier testimony, Dee was asked whether there was "anything that you would now change about the opinions that you gave during the course of the trial?" He responded: "No. It might be a little additional in terms of the corroboration I have and so forth, but I think it would be essentially the same."

The lead attorney on Pittman's original case, Robert Norgard, also testified regarding how he prepared for the penalty phase. At the time of the trial, Norgard was a trial attorney with the public defenders' office who had ten years of criminal experience. He was assigned to Pittman's case because of his experience in capital cases. Norgard was assisted on the case by Robert Trogolo, another attorney with the public defender's office, and two investigators, one of whom was a mitigation specialist who had been with the office for seven years by the time of Pittman's trial. Significantly, these investigators commenced their investigation well in advance of trial and obtained extensive records relevant to mitigation. Thus, for example, documents offered at the collateral hearing demonstrated that Norgard's team had obtained extensive documentation of Pittman's poor performance in school and Pittman's many childhood psychological issues. Norgard generally believed that it would not be helpful to present records like these one by one to the

19

jury; instead, he relied on witnesses like Dr. Dee to synthesize, summarize, and explain this body of mitigating evidence.

The postconviction trial court denied Pittman's penalty-phase-ineffective-assistance claim and the Florida Supreme Court affirmed. Pittman II, 90 So. 3d at 815–16. The Florida Supreme Court also denied Pittman's state habeas motion raising his claim regarding the exclusion of the Hodges testimony. Id. at 818.

Pittman raised several claims including the exclusion of the purportedly exonerating letter from Hodges and the ineffective assistance claim again in his § 2254 petition filed in United States District Court for the Middle District of Florida. The district court denied Pittman relief on all of his claims. As for the exclusion of evidence, the court determined that the Florida Supreme Court had applied a procedural bar in its decision on postconviction review and that this constituted an adequate and independent state law ground to deny relief. In the alternative, however, it addressed the merits and concluded that the Florida Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. As for ineffectiveness of counsel, the district court concluded that the Florida Supreme Court's Strickland determination was neither contrary to nor an unreasonable application of clearly established Supreme Court law. We granted a certificate of appealability as to these two claims.

20

II.

We review de novo a district court's denial of habeas relief pursuant to §

2254, as well as its legal conclusions and its resolution of mixed questions of law

and fact.  Wellons v. Warden, 695 F.3d 1202, 1206 (11th Cir. 2012).

Because Pittman's petition was filed after April 24, 1996, this case is

governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA").  Nejad v. Attorney Gen., State of Ga., 830 F.3d 1280, 1288 (11th Cir.

2016).  AEDPA limits the scope of federal habeas review of state court judgments

in the spirit of furthering "comity, finality, and federalism."  Michael Williams v.

Taylor, 529 U.S. 420, 436 (2000).  Thus, under AEDPA, a person in custody

pursuant to the judgment of a state court shall not be granted habeas relief on a

claim "that was adjudicated on the merits in State court proceedings" unless the

state court's decision was "contrary to, or involved an unreasonable application of,

clearly established Federal law as determined by the Supreme Court of the United

States; or . . . was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "For

§ 2254(d), clearly established federal law includes only the holdings of the

Supreme Court -- not Supreme Court dicta, nor the opinions of this Court."  Taylor

v. Sec'y, Fla. Dep't of Corr., 760 F.3d 1284, 1293–94 (11th Cir. 2014).

As for the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Terry Williams v. Taylor, 529 U.S. 362, 412–13 (2000). Under the "unreasonable application" clause, a federal habeas court may "grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts." Id. at 413. "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Lockyer v. Andrade, 538 U.S. 63, 76 (2003)). And "an 'unreasonable application of' [Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quotation omitted). To overcome this substantial hurdle, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). This is "meant to be" a difficult standard to meet. Id. at 102.

22

As for any factual findings, we must "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" Schriro v. Landrigan, 550 U.S. 465, 473–74 (2007) (quoting 28 U.S.C. § 2254(e)(1)). "Clear and convincing evidence is a 'demanding but not insatiable' standard, requiring proof that a claim is highly probable." Bishop v. Warden, GDCP, 726 F.3d 1243, 1258 (11th Cir. 2013) (quoting Ward v. Hall, 592 F.3d 1144, 1177 (11th Cir. 2010)). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) (quotations omitted and alterations adopted).

Finally, under § 2254(d)(1), "we review the state court's 'decision' and not necessarily its rationale." Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 785 (11th Cir. 2003) (citing Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002)). "Telling state courts when and how to write opinions to accompany their decisions is no way to promote comity." Wright, 278 F.3d at 1255. Requiring state courts to explain in detail their decisions "smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era." Id.

## III.

In his first claim, Pittman argues that the state trial court's exclusion of the testimony of George Hodges regarding the Watson letter deprived him of his

23

constitutional right to present a complete defense in violation of Chambers v.

Mississippi, 410 U.S. 284 (1973).   Before addressing the merits,[3] we must first

decide whether the Florida Supreme Court adjudicated the claim on the merits

entitling its determination to deference under § 2254(d)(1).

"When a federal claim has been presented to a state court and the state court

has denied relief, it may be presumed that the state court adjudicated the claim on

the merits in the absence of any indication or state-law procedural principles to the

contrary." Harrington, 562 U.S. at 99.  That presumption stands unless rebutted by

evidence from the state court's decision and the record that "leads very clearly to

the conclusion that the federal claim was inadvertently overlooked in state court."

Childers v. Floyd, 736 F.3d 1331, 1334 (11th Cir. 2013) (en banc) (quoting

Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013)) (alteration adopted).

Here, Pittman's Chambers claim was squarely presented to the Florida

Supreme Court on direct appeal; his brief addressed this claim at considerable

length and made it quite clear that he was raising a federal constitutional claim

along with his state law evidentiary claim.  He argued that the exclusion of the

Hodges testimony violated his right to present a defense as articulated in

---

[3] As an initial matter, the district court erred when it determined that the Florida Supreme Court's invocation of its rule against reconsideration of already determined claims constituted an adequate and independent state ground barring federal review.  "When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review."  Cone v. Bell, 556 U.S. 449, 466 (2009).  We, therefore, proceed to review this claim as though it were not treated as procedurally barred.

24

Chambers.  Notably, his brief focused not on compliance with the Florida hearsay rule, but instead on federal constitutional cases and Florida cases applying these principles.  Likewise, when the Florida Supreme Court reviewed the argument Pittman had made in the trial court, it would have been apparent that Pittman clearly focused on his Chambers claim.  Nonetheless, in addressing the Hodges evidence on direct appeal, the Florida Supreme Court said only that "the trial judge correctly excluded Hodges' testimony as substantive evidence under the hearsay rule and that there is no applicable hearsay exception."  Pittman I, 646 So. 2d at 172.

On collateral review, Pittman again raised the Chambers issue in his petition for a writ of habeas corpus filed directly with the Florida Supreme Court.  In the section of his brief addressing Chambers v. Mississippi, 410 U.S. 284 (1973), Pittman added a discussion of Holmes v. South Carolina, 547 U.S. 319 (2006), another case in the Chambers line addressing a constitutional override of a state evidentiary rule.  In Holmes, the Supreme Court struck down a South Carolina rule that precluded the defense from offering evidence of third party guilt if the prosecution case is based on forensic evidence.  547 U.S. at 328–29.  The Court held that this rule was not rationally related to a legitimate interest; "by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or

25

cast doubt." Id. at 331. Accordingly, applying the rule to exclude important defense evidence violated the petitioner's right to present a meaningful defense. Id. Again, there can be no doubt that Pittman had raised a constitutional claim.

The Florida Supreme Court held that it could not address Pittman's constitutional argument because "claims raised in a habeas petition which [Pittman] ha[d] raised in prior proceedings and which have been previously decided on the merits in those proceedings are procedurally barred in the habeas petition." Pittman II, 90 So. 3d at 818 (alteration omitted and emphasis added) (quoting Porter v. Crosby, 840 So. 2d 981, 984 (Fla. 2003)). Indeed, Florida's high court recognized that Pittman had raised a constitutional claim arising under Chambers and its progeny. Specifically, it acknowledged in footnote 11 that Pittman's argument was based on Holmes v. South Carolina and Williamson v. United States. Pittman II, 90 So. 3d at 818 & n.11. Holmes v. South Carolina squarely confronted the defendant's right to present a meaningful defense. 547 U.S. at 324. Williamson v. United States addressed the hearsay exception for statements against penal interest. 512 U.S. 594, 596 (1994).

For starters, because the issue was clearly presented in his initial appeal, we presume that the Florida Supreme Court adjudicated the claim on the merits. See Williams, 133 S. Ct. at 1096–97. Moreover, the Florida Supreme Court's rejection of this claim on collateral review because it had already been adjudicated "on the

26

merits," specifically citing to Holmes v. South Carolina, strongly suggests to us that Florida's high court did not overlook Pittman's constitutional claim. After all, we can see little reason why the Florida Supreme Court would have cited to a Supreme Court case addressing a defendant's right to present a meaningful defense and rule that the argument was barred because it had previously been rejected on the merits, if the court had not indeed previously rejected that argument on the merits. See Cone v. Bell, 556 U.S. 449, 466–67 (2009). Nothing in this record "leads very clearly to the conclusion that the federal claim was inadvertently overlooked in state court." Childers, 736 F.3d at 1334 (quotations omitted and alterations omitted). We are, therefore, obliged to afford the Florida Supreme Court deference under § 2254(d)(1). But even if we were to examine the Florida Supreme Court's determination without any deference, we would discern no error in its ruling on Pittman's exclusion of evidence claim.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations and quotations omitted). But that right is not unbounded. See Chambers, 410 U.S. at 302. "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and

27

evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Id. (emphasis added). But where those rules are "arbitrary or disproportionate to the purposes they are designed to serve" they must fall to the accused's right to present a defense. Rock v. Arkansas, 483 U.S. 44, 56 (1987).

The Florida Supreme Court's refusal to grant relief based on the exclusion of the Hodges letter and the proffered testimony was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Pittman says that Chambers v. Mississippi, 410 U.S. 284 (1973), Rock v. Arkansas, 483 U.S. 44, 56 (1987), Washington v. Texas, 388 U.S. 14 (1967), and Crane v. Kentucky, 476 U.S. 683 (1986), cannot be reconciled with the Florida Supreme Court's holding, but they are all easily distinguishable. In Rock, the Supreme Court placed great weight on the fact that an evidentiary rule operated to exclude the defendant's own testimony, see 483 U.S. at 57; whereas, here, Pittman's testimony was not at issue. And in Washington, the state had applied a common law bar on accomplice testimony, which the Supreme Court held was an "arbitrary rule[] that prevent[ed] whole categories of defense witnesses from testifying on the basis of a priori categories that presume them unworthy of belief." Id. at 16–17, 22–23. Finally, in Crane, the Supreme Court focused on the lack of justification for Kentucky's absolute bar on evidence related to the circumstances surrounding a confession. 476 U.S. at 691. No such arbitrary rule is in play here. To the

28

contrary, the Supreme Court has long recognized the substantial and legitimate interests served by the prohibition on hearsay testimony. See Chambers, 410 U.S. at 298.

The closest case to our facts actually is found in Chambers v. Mississippi, 410 U.S. 284 (1973). In that case, the defendant, Leon Chambers, was charged with the shooting of Officer Aaron "Sonny" Liberty during a chaotic riot outside a pool hall in Woodville, Mississippi. Id. at 285–87. One month before Chambers's trial, Gable McDonald, who had also been at the riot, returned to Woodville at the request of a man called Reverend Stokes. After speaking with Stokes, McDonald gave a sworn confession to Chambers's attorneys, and acknowledged that he had confessed to others. Id. at 287–88. One month later, McDonald repudiated his confession, claiming that he had been enticed to confess. Id. at 288. When Chambers attempted to call the three friends to whom McDonald confessed to testify at trial, the trial court excluded their testimony under Mississippi's hearsay rules, which provided no exception for statements made against penal interest. Id. at 289, 299. The Supreme Court held that this exclusion deprived Chambers of his constitutional right to present a defense because the statements were critical to Chambers's defense and "bore persuasive assurances of trustworthiness" thus taking them outside the rationale for the hearsay prohibition. Id. at 302.

29

Pittman's case is far from "materially indistinguishable" from Chambers. In Chambers, McDonald confessed at least four times; "[t]he sheer number of [McDonald's] independent confessions provided additional corroboration for each." Id. at 300. Here, Watson confessed at most once. McDonald's confessions were to friends with no motive to fabricate evidence against him, while Hodges had a clear motive to get back at Watson, a key witness in the prosecution that landed him on death row. While McDonald repudiated his confession, he never denied he had made the statement; here, significantly, Watson stated under oath that he never wrote the letter. What's more, in this case there was no letter produced, and Hodges' explanation of the letter's absence hardly inspires confidence -- he said he destroyed the letter because he thought it was a joke. No one thought McDonald was joking. Moreover, unlike Chambers, who produced evidence that McDonald had purchased a gun of the same caliber as the murder weapon just before the shooting, Pittman produced no physical evidence tying Watson to the crime. And unlike in Chambers, where eyewitnesses placed McDonald at the scene before, after, and even during the shooting, no witnesses ever placed Watson or his cousin at the Knowles residence that night or near Bonnie Knowles's burning Toyota the next morning. The Florida Supreme Court's rejection of Pittman's claim was not contrary to Chambers.

30

Nor was the decision an unreasonable application of clearly established federal law. The Florida hearsay rule is not arbitrary in general nor was the exclusion of the Hodges evidence disproportionate to the interests served by the rule. At the relevant time, Florida's Rules of Evidence excluded out of court statements offered to prove the truth of the matter asserted. Like many jurisdictions, Florida recognized an exception for statements made against penal interest. Under the rule, "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement." Fla. Stat. § 90.804(2)(c) (1989). The Florida rule thus largely tracks Chambers's holding. See Chambers, 410 U.S. at 302 (holding that the hearsay rule cannot be applied to exclude critical defense evidence that bears "persuasive assurances of trustworthiness").

The bar on hearsay remains firmly grounded in the state's legitimate interest in excluding unreliable and untrustworthy testimony from a jury's consideration.

> The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.

Chambers, 410 U.S. at 298.

31

Since hearsay prohibitions are not arbitrary, Pittman would only be entitled to a constitutional override of Florida's rules if Pittman had offered evidence that the Hodges' hearsay statement was sufficiently trustworthy and reliable. See, e.g., id. at 302 (holding that the generally valid prohibition on hearsay was overcome because the hearsay evidence "bore persuasive assurances of trustworthiness"). Pittman failed to meet his burden. The declarant, Watson, denied ever writing any confession letter, and the only evidence that this letter ever existed came from two death row inmates, one of whom had a powerful interest in seeing Watson prosecuted -- not only to get revenge because Watson had testified against him, but also to exonerate himself. Although it's not clear how, Hodges apparently believed that this letter would allow him to clear his own name. In his letter to Pittman's prosecutor, Hodges intimated that proving Watson committed the triple homicide would also prove that Hodges did not commit the murder he was convicted of. Indeed, at his deposition, Hodges said that his own conviction was "why [he] wrote [the letter]."

Nor did the weak and circumstantial evidence discovered by the defense team make up for these deficiencies. All defense counsel could confirm was that Gibbons and Watson frequented an area near the murder site, had used crack cocaine on occasion, matched some aspects of the witnesses' description of the man who was seen running away from Bonnie's car, and had destroyed evidence

by fire in the past. These facts fall far short of the "circumstances that provided considerable assurance of [the hearsay evidence's] reliability" in Chambers. 410 U.S. at 300. That's especially true where, as here, there was also evidence that undercut the Watson-as-perpetrator theory. Notably, the prosecution presented records establishing that Watson had checked in for work at 7 a.m. at Seminole Fertilizer on the morning after the murder, despite the fact that Bonnie Knowles's car had been set on fire some distance away around 6:40 a.m.

In as much as the Florida Supreme Court could reasonably have determined that the proffered evidence did not offer sufficient assurances of trustworthiness to override the traditional reliability concerns embodied in the hearsay rules, its decision to reject this claim was neither contrary to nor an unreasonable application of clearly established federal law under § 2254(d)(1), and the district court was correct to deny Pittman relief.

Indeed, we would not overturn the Florida Supreme Court's affirmance of the exclusion of this evidence even if our review was de novo. The accuracy of jury trials depends on adversarial testing, and the broad prohibition on hearsay evidence reflects an understanding that hearsay statements are not amenable to many of the methods our adversarial system relies on to test the quality of evidence. Chambers, 410 U.S. at 298. Hearsay statements are typically unsworn, and since the statement was made outside court, the jury is unable to assess the

33

tone and the demeanor of the speaker as they would with live witness testimony. Id. The declarant is also not subject to cross examination -- "the greatest legal engine ever invented for the discovery of truth." California v. Green, 399 U.S. 149, 158 (1970) (quotation omitted). Given the substantial reliability concerns surrounding Hodges's testimony, particularly his clear motive to point the finger at Watson, Watson's unambiguous denial under oath, and the absence of any letter, the trial court's exclusion of this hearsay evidence would not have violated the command of Chambers and its progeny even were we to consider the issue without affording any deference to Florida's high court.

The long and short of it is that Pittman sought to admit into evidence testimony from a death row inmate who claimed to have received and then destroyed a letter in which the lynchpin witness who put him on death row allegedly confessed to the triple homicide Pittman was accused of. It is not hard to understand why the trial court was skeptical of this story. Corroborating a peripheral fact here or there does not overcome the essential reliability concerns presented by this evidence. Whether applying deference or not, we can discern no error in this determination.

## IV.

Pittman also argues that his counsel provided ineffective assistance at the penalty phase of the trial by failing to uncover and present additional evidence

34

regarding Pittman's abusive childhood, substance abuse, and mental health,

including the possibility that Pittman had brain damage.  The Florida Supreme

Court affirmed the denial of this claim in these words:

> Pittman asserts that trial counsel was ineffective in the penalty phase in failing to present additional evidence of mental health issues and other mitigation. He asserts that the postconviction court erred in denying relief on this claim. He claims that defense counsel was ineffective in the following ways: (1) in failing to present four additional witnesses -- Robert Barker, Michael Pittman, Jean Wesley and Tillie Woody -- to attest to his substance abuse and life-long afflictions, and (2) in failing to elicit additional information from three witnesses -- Tammie Davis, William Pittman, and Dr. Dee -- who testified during the penalty phase. This issue was addressed at the evidentiary hearing below and the postconviction court addressed it at length in its order denying relief, concluding as follows:
>
>> Although the testimony of these witnesses presents a harsh and depressing picture with respect to Mr. Pittman's childhood, drug use and sexual abuse, the court does not find that the defense has shown that trial counsel's performance with regard to presenting mental health and other mitigation evidence fell below an objective standard of reasonableness. Dr. Dee testified at trial regarding Mr. Pittman's mental health issues, drug problems, and sexual abuse. Claim VII of Defendant's Motion is denied.
>
> Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. The court's factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that counsel rendered deficient performance in the penalty phase and that the defendant was thereby prejudiced. Under the above standard of review, Pittman has failed to show that trial counsel was ineffective in this respect.

Pittman II, 90 So. 3d at 815–16.

35

Strickland v. Washington, 466 U.S. 668 (1984), governs Pittman's claim of ineffective assistance. To satisfy the Strickland standard, Pittman "must show that: (1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense." Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1209 (11th Cir. 2007). "In considering claims that counsel was ineffective at the penalty phase of trial, we determine whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court." Id. (quotation omitted). "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Wiggins, 539 U.S. at 533. Instead, the standard for counsel's performance is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. What is reasonable will depend on the context of the particular case. See Wiggins, 539 U.S. at 522–23.

In evaluating counsel's performance, our review is objective. McClain v. Hall, 552 F.3d 1245, 1253 (11th Cir. 2008). "Because this standard is objective, it matters not whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight. The relevant question is not what actually

36

motivated counsel, but what reasonably could have motivated counsel." Gordon v. United States, 518 F.3d 1291, 1301 (11th Cir. 2008) (citation omitted).

"Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Harrington, 131 S. Ct. at 788 (citations omitted). "Given the strong presumption in favor of competence, the petitioner's burden of persuasion -- though the presumption is not insurmountable -- is a heavy one." Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000).

Pittman asserts that his counsel's performance was deficient because he failed to "obtain records, talk to teachers, properly interview family members, and locate and interview those familiar with Pittman and his history." This claim is flatly contradicted by the record. Pittman was represented by experienced counsel, and his counsel was assisted by an experienced mitigation specialist investigator. Notably, the team began preparing for the penalty phase at least six months in advance of trial, and interviewed many more witnesses than were ultimately presented at the penalty phase. Based on a comprehensive investigation, Pittman's attorneys made a thorough penalty phase presentation consisting of testimony from nine witnesses that spanned some 215 pages of trial transcript.

37

Of the witnesses that Pittman presented before the postconviction court, only one testified that he had not been interviewed by the defense -- Michael Pittman, petitioner's brother, who had been in the military stationed in Louisiana at the time. Robert Barker did not testify one way or the other, but defense records suggest that he was interviewed regarding any information he might have relevant to the penalty phase.  As for the two teachers, both Tillie Woody and Jean Wesley testified that they had been interviewed before the original trial.  They testified that Pittman was functioning behind grade level, but otherwise said they had no significant problems with Pittman.  Both testified that he was not particularly hyperactive or aggressive.  In light of this testimony, Norgard may well have not called them to testify during the penalty phase because he concluded that these witnesses would undercut his theory that Pittman was under the constant strain of a congenital birth defect exacerbated by childhood injuries and manifesting itself as hyperactivity, impulsivity, and aggression.

Pittman also claims that his counsel's performance was deficient because he failed to offer evidence that would have given a fuller picture of the childhood physical abuse, evidence that would have established Pittman's heavy drug use, and evidence that would have corroborated a history of childhood sexual abuse. None of these objections have merit either.

38

First, Pittman's childhood abuse was on full display at the original trial. The testimony of Pittman's family (Freddy Joe Farmer, Bill Pittman, Nina Jane Farmer, Barbara Ann Farmer, Eugene Pittman, Bobbi Jo Pittman, and Francis Marie Pittman) could have left no doubt in the mind of either the judge or the jury that Pittman's mother was physically abusive and that Pittman had had a very rough childhood. In fact, his mother testified at length about the constant abuse she meted out on her children and her efforts to avoid detection. Among other things, she testified that she beat her children with everything from belts to broom handles to two-by-fours, and the evidence established that the petitioner got the worst of the abuse. It was not unreasonable for counsel to think this was enough to make the point.

As for Pittman's argument that his counsel should have highlighted his drug abuse in the mitigation phase, we have often commented that substance abuse evidence can be a "two-edged sword." Stewart, 476 F.3d at 1217; Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) ("[A] showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing."). "Rarely, if ever, will evidence of [substance abuse] be so powerful that every objectively reasonable lawyer who had the evidence would have used it." Stewart, 476 F.3d at 1217. In defense counsel's opening statement he emphasized that Pittman's problems were not of his own making. Highlighting

39

Pittman's voluntary drug use may well have undercut this theory. We cannot say that a strategic decision not to further emphasize Pittman's drug use was objectively unreasonable. See Rogers v. Zant, 13 F.3d 384, 388 (11th Cir. 1994) (noting reasonableness of lawyer's possible fear that defendant's voluntary drug and alcohol use could be "perceived by the jury as aggravating instead of mitigating") (emphasis omitted).

The evidence presented during the original penalty phase regarding sexual abuse came from Dr. Dee relating that Pittman had told him he had been abused by two men. At his postconviction hearing, Pittman presented testimony from one brother who would have confirmed this abuse and from another brother who could have speculated about additional abuse. Pittman argued that the failure to uncover and present the additional corroborating evidence constitutes deficient performance. However, counsel is not required to track down every lead. And sexual abuse is no different. See Anderson v. Sec'y, Fla. Dep't of Corr., 752 F.3d 881, 908 (11th Cir. 2014) (holding that the failure to uncover and present evidence of sexual abuse was not deficient performance where counsel put on an otherwise comprehensive mitigation defense). It was neither an unreasonable application of nor contrary to clearly established federal law for the Florida Supreme Court to conclude that the failure to run this particular lead to ground did not take counsel's

40

performance below an objective standard of reasonableness in light of the overall investigation.

Moreover, Pittman has not shown that any of these claimed failures was prejudicial. To establish prejudice under Strickland, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. We conduct this inquiry by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence" and asking whether there is a reasonable probability of a different sentence. Cullen v. Pinholster, 563 U.S. 170, 198 (2011) (quotation omitted). When reweighing aggravators and mitigators, we focus on their weight, rather than their sheer number. Boyd v. Allen, 592 F.3d 1274, 1302 n.7 (11th Cir. 2010).

At the penalty phase, Dr. Henry Dee, a superbly qualified mental health expert, testified at length, summarizing and synthesizing the testimony elicited from Pittman's family members, and explaining how organic brain damage coupled with a childhood of extreme trauma and instability would manifest itself in severe psychiatric disabilities later in Pittman's life. He testified again at Pittman's postconviction hearing. And after listening to all of the additional testimony, Dr. Dee was asked whether there was "anything that you would now change about the opinions that you gave during the course of the trial?" He responded: "No. It

41

might be a little additional in terms of the corroboration I have and so forth, but I think it would be essentially the same."

Pittman argues, nevertheless, that the Florida Supreme Court's Strickland determination on the prejudice prong was "contrary to" Sears v. Upton, 561 U.S. 945 (2010), because the Florida Supreme Court failed to perform "a probing and fact-specific analysis" of prejudice. Id. at 955. But Pittman takes Sears out of context. In Sears, the Supreme Court was sitting in direct review of the decision of the Georgia postconviction court. Accordingly, it was not required to give AEDPA deference to the state court decision and could demand a more fulsome analysis. See Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1330 (11th Cir. 2013) ("[U]nlike the state court decision in this appeal, the decision in Sears was not subject to deferential review under section 2254(d) because the defendant had directly appealed the decision of the state court on state collateral review."). When § 2254(d)(1) deference applies, we are precluded from employing such exacting scrutiny; rather, we are required to determine whether the state court's adjudication was objectively unreasonable. See, e.g., Williams, 133 S. Ct. at 1095 (2013) (noting that "federal courts have no authority to impose mandatory opinion-writing standards on state courts").

Pittman also says that the Florida Supreme Court's decision on prejudice was an unreasonable application of Strickland because the decision of the trial

court indicates that the decision would likely have been different had Dr. Dee's testimony been corroborated. As for Pittman's capacity to conform his conduct to the law, the trial court commented that "[e]xcept for the solicited opinions of the Defendant's expert . . . this mitigating circumstance is unsupported by any other evidence in the record." The trial court made the same observation with regard to the evidence of brain damage. But though the trial court did comment on the lack of corroboration, it certainly did not say the decision would have been different had additional corroboration been provided. Rather, the trial court focused on the lack of evidence connecting the mitigation evidence to the circumstances of the particular offense and contrasted that with the substantial evidence of Pittman's calculated planning in accomplishing the murders.

In this regard, this case is similar to Ponticelli v. Sec'y, Fla. Dep't of Corr., 690 F.3d 1271 (11th Cir. 2012). In Ponticelli, the defendant argued that the state court had rejected his mental health testimony relating to his alleged cocaine-induced mental disturbance because there was no evidence about his use of cocaine on the night of the murders. Id. at 1297. Thus, the defendant argued that it was objectively unreasonable to conclude that new evidence of cocaine use would be cumulative rather than prejudicial. We rejected this argument because the state court's rejection of the mental health evidence was also based on the fact that

defendant's "actions on the night of the murder strongly suggested that he was in control of his actions." Id.

The same analysis applies here. Throughout his sentencing order, the trial court focused on the heinous nature of the acts, the number of homicides, and the deliberate steps Pittman took to accomplish the murder and avoid detection. After summing up the mitigating evidence, the trial judge concluded:

> Taking all these mitigating circumstances in a light most favorable to the Defendant, the Court finds they have little if any connection to the murders. The record speaks clearly of an individual who went about the killings and the destruction of evidence in a deliberate, methodical and efficient manner to such an extent that detection was nearly avoided. But for a lady picking roses early one morning who happened to see the Defendant running from Bonnie Knowles' burning car, the case might not have been successfully prosecuted.
>
> While addressing meaningful facts, the record reflects another that enlightens upon the issues of the Defendant's intentions and his capacity to understand what he was doing was unlawful. That fact was the Defendant's cutting of the telephone lines. This was admitted by the Defendant to witness Hughes as being done before the Defendant entered the home of the victims.
>
> THE COURT, therefore, finds the aggravating circumstances established by the proper burden of proof to substantially outweigh all mitigating circumstances reflected in the record.

Pittman I, 646 So. 2d at 169 n.2. Read as a whole, this order provides little support for Defendant's claim that the lack of corroborating evidence was the deciding factor in the sentencing court's decision. On this record, it was not unreasonable

44

for the Florida Supreme Court to conclude that Pittman had failed to establish prejudice.

Finally, Pittman argues that when the additional evidence presented on collateral review is considered cumulatively against the aggravators presented at trial, there is a reasonable probability of a different outcome. See Cullen, 563 U.S. at 198. We remain unpersuaded. The defendant faced an uphill battle. Pittman had been convicted of a triple homicide that involved a high degree of violence and many indicia of premeditation. He snuck out the back door of his father's house after everyone else was asleep and cut the phone line to the victims' house. Once inside, he stabbed to death three members of his ex-wife's family. He set the house on fire, stole his sister-in-law's car, drove it some distance away, and then set it on fire too. Based on these facts, the trial judge found that each of the three murders was committed in a manner that was heinous, atrocious, and cruel. Pittman I, 646 So. 2d at 169 n.2. In Florida, "the heinous, atrocious, or cruel" aggravator is one of the "most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999). In the face of these facts and the extensive mitigating evidence offered by defense counsel at the penalty phase, adding all of this together, the good and the bad, there is no reasonable probability that the additional mitigating evidence would have changed the outcome. Wiggins, 539 U.S. at 534. It was neither an unreasonable application

45

of nor contrary to clearly established federal law for the Florida Supreme Court to determine that Pittman had failed to establish prejudice.

Quite simply, the Florida Supreme Court reasonably applied clearly established Supreme Court law.  Pittman has failed to meet his burden under § 2254(d) and is not entitled to relief.  Accordingly, we deny Pittman's petition for a writ of habeas corpus.

AFFIRMED.

JORDAN, Circuit Judge, concurring in the judgment.

I agree that Mr. Pittman is not entitled to habeas relief on his two claims, but my analysis differs somewhat from that of the majority.

1. In my opinion the Florida Supreme Court completely failed to address, on direct appeal, Mr. Pittman's federal due process claim under *Chambers v. Mississippi*, 410 U.S. 284 (1973), and its progeny. As the majority notes, Mr. Pittman clearly asserted this constitutional claim in the trial court and on appeal, yet the Florida Supreme Court only addressed a non-existent claim under state hearsay law. *See Pittman v. State*, 646 So. 2d 167, 172 (Fla. 1994). Applying the analysis set forth in *Childers v. Floyd*, 736 F.3d 1331, 1334 (11th Cir. 2013) (en banc), I conclude that Mr. Pittman has successfully rebutted the presumption that the Florida Supreme Court addressed and resolved the *Chambers* claim on the merits. *See, e.g., Bester v. Warden*, 836 F.3d 1331, 1336–37 (11th Cir. 2016). I would therefore review the *Chambers* claim without AEDPA deference.

Under plenary review, however, Mr. Pittman's *Chambers* claim fails. As the majority correctly explains, *see* Maj. Op. at 34–35, the circumstances surrounding Mr. Watson's letter did not provide sufficient assurance of reliability. *See Chambers*, 410 U.S. at 300.

47

2.    With respect to the Sixth Amendment claim, I agree with the majority that Mr. Pittman's attorneys provided effective assistance of counsel at the penalty phase.  *See* Maj. Op. at 35–41.  I therefore would not address the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984).

With these thoughts, I concur in the judgment.